624

### THE GRAY PROCESSES CORPORATION, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 95279.    Promulgated February 14, 1941.

*Benjamin H. Bartholow, Esq.*, for the petitioner.
*W. Frank Gibbs, Esq.*, for the respondent.

OPINION.

HARRON: The first question is whether the amounts which were paid by petitioner in the taxable years to the stockholders' committee in accordance with subparagraphs (a), (b), and (c) of paragraph 27 of the agreement should be excluded from its taxable income in those years.

Under subparagraph (a) of paragraph 27 of the agreement petitioner was to pay to the stockholders' committee an amount equal to 50 percent of the amount actually collected in each calendar quarterly period as royalties received on account of present installed treating capacity of present licensees of petitioner; under subparagraph (b) petitioner was to pay to the stockholders' committee an amount equal to 20 percent of the amount actually collected in each calendar quarterly period (1) as royalties received from present licensees of petitioner on account of capacity in excess of their present installed treating capacity, (2) as royalties received from others than present licensees of petitioner, and (3) as amounts received from the oil companies as gross royalties derived from licenses which they might, after the closing date, grant under their patent rights, and as the net recoveries from infringers thereof; and under subparagraph (c) petitioner was to pay to the stockholders' committee an amount equal to 20 percent of the amount actually collected in each calendar quarterly period as amounts recovered from infringers of patent rights and as all other amounts actually received by petitioner arising out of its business from and after the closing date after deducting therefrom all costs of collection. Petitioner was to continue to make the payments under subparagraphs (a), (b), and (c) as long as it was in receipt of any of the amounts specified in those subparagraphs.

In the taxable years the entire receipts of petitioner consisted of royalties, with the exception of very small amounts received as interest; the amounts received as interest were so small that, for the purposes of this opinion, it will be assumed that the entire receipts of petitioner in the taxable years consisted of royalties. Petitioner paid to the stockholders' committee in accordance with subparagraph (a) $106,099.89 in 1934, $99,593 in 1935, and $98,630.37 in 1936; and in accordance with subparagraphs (b) and (c) $992.08 in 1934, $1,830.04 in 1935, and $33,339.64 in 1936, or a total of $107,091.97 in 1934, $101,423.04 in 1935, and $131,970.01 in 1936.

On its income tax returns for the years 1934 and 1935 petitioner did not exclude from its taxable income the amounts which it paid to the stockholders' committee in accordance with subparagraphs (a), (b), and (c) of paragraph 27 of the agreement, but reported in its taxable income the entire amounts which it received as royalties and then deducted the amounts which it paid to the stockholders' committee in accordance with subparagraphs (a), (b), and (c). Respondent disallowed the deductions on the ground that the amounts which petitioner paid to the stockholders' committee in accordance with subparagraphs (a), (b), and (c) constituted a distribution of profits. On its income tax return for the year 1936 petitioner excluded from its taxable income the amounts which it paid to the stockholders' committee in accordance with subparagraphs (a), (b), and (c), with the explanation that it had received such amounts "as trustee" for the stockholders' committee "representing the beneficial owners of the amounts." Respondent included the amounts which petitioner paid to the stockholders' committee in accordance with subparagraphs (a), (b), and (c) in petitioner's taxable income.

In its briefs petitioner contends that the amounts which it paid in the taxable years to the stockholders' committee in accordance with subparagraphs (a), (b), and (c) should be excluded from its taxable income. The substance of petitioner's argument is that the amounts which it paid in the taxable years to the stockholders' committee in accordance with subparagraphs (a), (b), and (c) were not a part of the purchase price which was to be paid for the capital stock of petitioner, but that the effect of subparagraphs (a), (b), and (c) was to transfer from petitioner to the stockholders' committee an interest in petitioner's license agreements, and that thus in the taxable years petitioner merely acted as an agent, or conduit, in collecting and paying to the stockholders' committee the royalties derived from its interest in petitioner's license agreements. On the other hand, in his briefs respondent contends that the amounts which petitioner paid in the taxable years to the stockholders' committee in accordance with subparagraphs (a), (b), and (c) were a part of the purchase price which was to be paid for the capital stock of petitioner and that the effect of subparagraphs (a), (b), and (c) was not to transfer from petitioner to the stockholders' committee any interest in petitioner's license agreements. Both parties agree that, in the final analysis, the inclusion or exclusion of the amounts in question on petitioner's taxable income depends upon whether or not, under the agreement, the payments under subparagraphs (a), (b), and (c) were a part of the purchase price which was to be paid for the capital stock of petitioner. Both parties apparently reason that, if under the agreement the payments under subparagraphs (a), (b), and (c) were a part of the purchase price, it follows that peti-

tioner was the owner of the entire amounts which it received in the taxable years as royalties and that the amounts in question should not be excluded from petitioner's taxable income; but that, if under the agreement the payments under subparagraphs (a), (b), and (c) were not a part of the purchase price, it follows that petitioner merely acted as an agent, or conduit, in collecting and paying over to the stockholders' committee the royalties derived from its interest in petitioner's license agreements, and that the amounts in question should be excluded from petitioner's taxable income. Thus the answer to the question is to be found in an interpretation of the agreement.

In our opinion, the amounts in question should not be excluded from petitioner's taxable income. A careful examination of the agreement compels the conclusion that the payments under subparagraphs (a), (b), and (c) of paragraph 27 were a part of the purchase price which was to be paid by petitioner on behalf of the oil companies to the stockholders' committee for the purchase of the capital stock of petitioner. Subparagraphs (a), (b), and (c) are contained in that part of the agreement which deals with the purchase price which was to be paid for the capital stock of petitioner. Subparagraphs (a), (b), and (c) are immediately preceded by paragraph 26, which provides for the payment of $500,000 by the oil companies on the closing date, and are immediately succeeded by subparagraph (d), which provides for the payment by petitioner of amounts representing the total estimated net income of petitioner for each calendar quarterly period remaining after making the payments under subparagraphs (a), (b), and (c) until the payments under subparagraph (d) should aggregate $500,000. Thus subparagraphs (a), (b), and (c) are flanked by provisions which admittedly deal with the purchase price which was to be paid for the capital stock of petitioner.

The conclusion that the payments under subparagraphs (a), (b), and (c) were a part of the purchase price which was to be paid for the capital stock of petitioner is strengthened by the absence of any provision in the agreement either expressly or impliedly transferring from petitioner to the stockholders' committee any interest in petitioner's patent property or license agreements. It is pointed out that prior to the execution of the agreement the then stockholders of petitioner had no interest in petitioner's patent property or license agreements. Cf. *Helvering* v. *O'Donnell*, 303 U. S. 370. Paragraph 20 of the agreement deals with the so-called "reserved" assets of petitioner which were to be transferred from petitioner to the stockholders' committee. Under that paragraph substantially all of the assets of petitioner, with the notable exception of its patent property and license agreements, were to be transferred from petitioner to the stockholders' committee. In view of the very careful specification

of the assets which were to be transferred, the failure of the parties to provide in that paragraph for the transfer from petitioner to the stockholders' committee of any interest in petitioner's patent property or license agreements appears deliberate.

The provisions of subparagraphs (a), (b), and (c) did not effect an assignment from petitioner to the stockholders' committee of any interest in petitioner's patent property or license agreements, or even in the royalties to be derived therefrom. Under subparagraphs (a), (b), and (c) petitioner simply promised to pay to the stockholders' committee amounts equal to certain designated percentages of the amounts actually received by petitioner from royalties and other sources. It is pointed out that before petitioner was obligated to pay, it had to receive, cf. *Lansill* v. *Burnet*, 58 Fed. (2d) 512; *Fay Harvey Moore*, 42 B. T. A. 949; and that even upon receipt, petitioner was not obligated to pay out of any designated fund. Cf. *Lansill* v. *Burnet, supra; Fay Harvey Moore, supra.* The test of a legal or equitable assignment has been stated to be "whether the debtor would be justified in paying the debt, or the portion contracted about, to the person claiming to be assignee." *Donovan* v. *Middlebrook*, 95 App. Div. 365, 367; 88 N. Y. S. 607; *Fairbanks* v. *Sargent*, 117 N. Y. 320; 22 N. E. 1039; *Lanigan's Administrator* v. *Bradley & Currier Co.*, 50 N. J. Eq. 201; 24 Atl. 505. Merely by reason of the provisions of subparagraphs (a), (b), and (c) no licensee or other debtor of petitioner would be justified in paying directly to the stockholders' committee any portion of the amounts which he owed to petitioner. It follows that under subparagraphs (a), (b), and (c) petitioner simply made a personal covenant to pay the various amounts specified therein and did not make a legal or equitable assignment of any interest in its patent property or license agreements, or even in the royalties to be derived therefrom. Cf. *Helvering* v. *O'Donnell, supra.*

A further examination of the agreement indicates that petitioner was to have complete control over the entire amounts which it received from royalties and other sources. A provision requiring the segregation of the amounts which petitioner subsequently was obliged to pay to the stockholders' committee under subparagraphs (a), (b), and (c) is conspicuously absent from the agreement. Cf. *Central Life Assurance Society Mutual* v. *Commissioner*, 51 Fed. (2d) 939. Under paragraph 21 of the agreement petitioner was to have the right to set off any amounts payable under subparagraphs (a), (b), and (c) against any liabilities existing on the closing date. And under paragraph 31 of the agreement each of the oil companies from time to time was to lend to petitioner one-quarter of such sums as might reasonably be required by petitioner as working capital so as to permit petitioner to make the payments under subparagraphs (a), (b), and (c).

Moreover, under the agreement petitioner was to have substantially complete control over its patent property and license agreements, at least subsequent to the release of the stock from escrow and the consequent passage of title thereto to the oil companies. It should be emphasized that passage of title to the stock was dependent upon the $500,000 payment to be made by the oil companies under paragraph 26 and the further payments aggregating $500,000 to be made by petitioner under subparagraph (d) of paragraph 27, and not upon the payments to be made by petitioner under subparagraphs (a), (b), and (c). Prior to passage of title to the stock petitioner had the right to sell, assign, or otherwise dispose of or encumber any of its patent property only with the written consent of all the other parties to the agreement. However, after passage of title to the stock petitioner apparently had the right to dispose of or encumber any of its patent property without the consent of the other parties to the agreement even though petitioner was still under obligation to make the payments under subparagraphs (a), (b), and (c). Moreover, petitioner at all times had substantially complete control over the granting of licenses. The only limitations upon petitioner's control over the granting of licenses were that under paragraph 30 of the agreement petitioner was to grant licenses to the oil companies in accordance with certain prescribed forms and that under paragraph 29 of the agreement petitioner was not to grant licenses containing a privilege to grant sublicenses except with the written consent of the other parties to the agreement. The scale of royalty rates set forth in paragraph 28 was not an actual limitation upon petitioner's control over the granting of licenses. Under subparagraph (e) of paragraph 27, if the royalty rates payable by petitioner's licensees (other than the oil companies) under the terms of their respective license agreements (except royalty rates prescribed by license agreements in effect on the closing date) were in any case less than the scale of royalty rates set forth in paragraph 28, petitioner was to pay to the stockholders' committee, in addition to the payments under subparagraphs (a), (b), and (c), additional amounts equal to the specified percentages of the difference between the amounts actually collected and the amounts which would have been collected if the royalty rates had been the same as those set forth in paragraph 28. It is thus apparent that petitioner was not required under subparagraph (e) of paragraph 27 to incorporate the scale of royalty rates set forth in paragraph 28 in the licenses which it granted subsequent to the execution of the agreement.

The conclusion that the payments under subparagraphs (a), (b), and (c) were a part of the purchase price for the stock and that petitioner did not transfer any interest in its patent property or license agreements or in the royalties derived therefrom finds support in

the interpretation of the agreement which was made by the stockholders' committee immediately prior to the execution of the agreement. In the notices which the stockholders' committee sent out to the then stockholders of petitioner the committee stated that it obviously could not advise "as to the total price per share" which might be received for stock sold under the terms of the agreement, but that it was estimated that the proceeds of sale during the first three years of operation of the agreement would aggregate at least $14 per share "and thereafter additional amounts from year to year as long as the business continues without substantial impairment." Thus it was clearly the understanding of the stockholders' committee that the payments under subparagraphs (a), (b), and (c), which were to continue after the first three years of operation of the agreement, were a part of the purchase price of the stock. Furthermore, in the notices the stockholders' committee stated that the agreement provided for the reservation for the benefit of the then stockholders of petitioner of the entire net assets of petitioner, "except its patent property and license contracts." Thus it was also the understanding of the stockholders' committee that petitioner was not to transfer any interest in its patent property and license agreements to the stockholders. The action of the former stockholders of petitioner subsequent to the execution of the agreement was in conformity with the understanding of the agreement expressed by the stockholders' committee in the notices. In filing their income tax returns for the years subsequent to the execution of the agreement the former stockholders of petitioner treated the payments made by petitioner under subparagraphs (a), (b), and (c) as being in payment of their stock. Even petitioner in filing its income tax returns for 1934 and 1935 did not exclude from its taxable income the payments made by it under subparagraphs (a), (b), and (c). Little weight is to be attached to the fact that the oil companies did not charge the payments made by petitioner under subparagraphs (a), (b), and (c) to their investment in the stock of petitioner.

Petitioner points to the fact that under paragraph 22 the passage of title to the stock to the oil companies was conditioned only upon the completion of the $500,000 payment which was to be made by the oil companies on the closing date under paragraph 26 and the payments aggregating $500,000 which were to be made by petitioner over a period of years under subparagraph (d) of paragraph 27 and not upon the completion of the payments which were to be made by petitioner under subparagraphs (a), (b), and (c). Petitioner argues that this fact conclusively shows that the payments which were to be made by it under subparagraphs (a), (b), and (c) were not a part of the purchase price of the stock. There is little merit in this argument. The parties to a sale can provide, and frequently do provide,

for the passage of title before payment of all or even any part of the purchase price. *Dahlinger* v. *Commissioner*, 51 Fed. (2d) 662; certiorari denied, 284 U. S. 673. Petitioner also points to the fact that in paragraph 22 the time of the passage of title to the stock is referred to as the consummation of the sale and argues that this fact also shows that the payments which were to be made by it under subparagraphs (a), (b), and (c) were not a part of the purchase price of the stock. This argument, too, possesses but little merit. The consummation of a sale depends not upon the payment of the purchase price but upon the passage of title; and a sale is consummated when title passes, even though the purchase price is not yet paid. *Dahlinger* v. *Commissioner, supra.*

Petitioner urges that two considerations of "logic and normal business practice" support its contention that the payments which were to be made by it under subparagraphs (a), (b), and (c) were not a part of the purchase price of the stock. The substance of the first of the two considerations urged by petitioner is that, if the continuing payments under subparagraphs (a), (b), and (c) were a part of the purchase price of the stock, then the oil companies would never be in a position to ascertain the cost of the stock as long as the payments continued. This first consideration is entitled to but little weight. The ascertainment of the cost of the stock to the oil companies was simply a matter of adding the payments made by petitioner under subparagraphs (a), (b), and (c) to the rest of the consideration which had been paid for the stock. Apparently the former stockholders in filing their returns for the taxable years were able to compute the gain realized from the sale of the stock even though they treated the payments made by petitioner under subparagraphs (a), (b), and (c) as a part of the purchase price. It should be emphasized that somewhat similar provisions for continuing payments of the purchase price are not uncommon in contracts of sale. Cf. *Helvering* v. *O'Donnell, supra.* The substance of the second of the two considerations urged by petitioner is that, if the continuing payments under subparagraphs (a), (b), and (c) were a part of the purchase price of the stock, then this would mean that the stockholders' committee had adopted the "unheard-of practice" of protecting the stockholders by a carefully drawn escrow agreement against a default in the early assured payments of the purchase price and not protecting the stockholders against a default in the later, doubtful payments. This second consideration is entitled, similarly, to but little weight. It is sufficient to point out that the promise of petitioner to make the payments under subparagraphs (a), (b), and (c) was guaranteed by the Texas Corporation, the Standard Oil Co. of Indiana, the Standard Oil Development Co., and the Pure Oil Co. The guarantee of these oil companies would seem

to constitute substantial protection against a default by petitioner in the payments under subparagraphs (a), (b), and (c).

As further support of its contention that the payments under subparagraphs (a), (b), and (c) were not a part of the purchase price of the stock, petitioner argues that these payments did not benefit the oil companies, the purchasers of the stock. This argument is unfounded. In promising to make the payments under subparagraphs (a), (b), and (c) of paragraph 27, as well as the payments under subparagraph (d), petitioner was acting on behalf of the oil companies. If provision had not been made in the agreement for the payments under subparagraphs (a), (b), and (c), provision would have had to have been made for some other form of consideration for the stock. In the event of a default in the payments under subparagraphs (a), (b), and (c), even though title to the stock had passed to the oil companies, the stockholders' committee could proceed not only against petitioner but also against the oil companies on their guarantees. ¦ The conclusion is inescapable that the payments under subparagraphs (a), (b), and (c) directly benefited the oil companies.

(The above interpretation of the agreement compels the conclusion that petitioner was the sole owner of the entire amounts of royalties which it received in the taxable years, as well as the sole owner of the patent property and license agreements which produced the royalties in question. It follows that the entire amounts of royalties which petitioner received in the taxable years should be included in its taxable income without the exclusion of the amounts which it later paid to the stockholders' committee in the taxable years under subparagraphs (a), (b), and (c) of paragraph 27 of the agreement. Cf. *Helvering* v. *Clifford*, 309 U. S. 331; *Anderson* v. *Helvering*, 310 U. S. 404; *Helvering* v. *Horst*, 311 U. S. 112; *Lansill* v. *Burnet*, *supra; Fay Harvey Moore*, *supra*.

In our opinion the cases cited by petitioner in its briefs are distinguishable. Proceeding on the assumption that the stockholders' committee had the beneficial interest in a part of the royalties which petitioner received in the taxable years, petitioner cites the following cases as enunciating the principle "that the purpose of the income tax laws is to tax income to the person having the beneficial interest therein and not to the mere collector or conduit of income belonging to another": *Central Life Assurance Society Mutual* v. *Commissioner*, *supra; Bettendorf* v. *Commissioner*, 49 Fed. (2d) 173; *Mark D. Eagleton*, 35 B. T. A. 551; affd., 97 Fed. (2d) 62; *Shellabarger* v. *Commissioner*, 38 Fed. (2d) 566; *112 West 59th Street Corporation* v. *Helvering*, 68 Fed. (2d) 397; *Commissioner* v. *Turney*, 82 Fed. (2d) 661; *Decatur Water Supply Co.* v. *Commissioner*, 88 Fed. (2d) 341; *Parish-Watson & Co.*, 2 B. T. A. 851; *Mente & Co.*, 29 B. T. A. 804;

*Michael Fay et al., Executors*, 34 B. T. A. 662; *Christian H. Droge*, 35 B. T. A. 829; *Samuel L. Huntington*, 35 B. T. A. 835; *Mountain View Cemetery Association*, 35 B. T. A. 893; *Ferncliff Cemetery Mausoleum Co.*, 35 B. T. A. 1037. The assumption on which petitioner proceeds in citing these cases is unsound because in fact petitioner was not a mere collector or conduit, but had the entire beneficial interest in the royalties which it received in the taxable years. Petitioner relies in particular upon *Central Life Assurance Society Mutual* v. *Commissioner, supra; Bettendorf* v. *Commissioner, supra;* and *Mark D. Eagleton, supra.* In *Central Life Assurance Society Mutual* v. *Commissioner, supra,* the taxpayer was organized for the purpose of taking over the assets and assuming the liabilities of the Central Life Assurance Society; the taxpayer was organized to do only a participating life insurance business, while its predecessor was organized to do both a participating and a nonparticipating life insurance business; under the transfer agreement the taxpayer was to maintain a separate department for the nonparticipating life insurance business and was to pay to the stockholders of its predecessor any earnings from the nonparticipating business for a period of twenty-two years, within which period it was estimated that the entire nonparticipating business would be liquidated; and after the transfer the earnings of the nonparticipating business were segregated by petitioner and handled in a separate department. As the Circuit Court stated: "These earnings never became the absolute property of petitioner, and it could lawfully do with them but one thing, which was to pay them over in accordance with the contract. It secured no beneficial interest whatsoever from them. There was as complete segregation of these earnings as could possibly be made under the circumstances." In *Bettendorf* v. *Commissioner, supra,* the original owner of certain securities transferred the securities to the taxpayer in accordance with an agreement under which the original owner expressly reserved for life the right to the income from the securities. The Circuit Court stated that by assenting to the reservation the taxpayer became a trustee for the original owner and was required to account to the original owner for the income received from the securities. In *Mark D. Eagleton, supra,* certain outside attorneys obtained personal injury cases and then turned them over to the taxpayer, an attorney, for handling under agreements to divide the fees. The Board pointed out that the taxpayer and the outside attorneys had joint interests in the cases and in the fees collected by the taxpayer. On the assumption that subparagraphs (a), (b), and (c) of paragraph 27 of the agreement effected an assignment from the petitioner to the stockholders' committee of a part of the royalties which petitioner received in the taxable years, petitioner cites the

following cases as supporting the principle that "assigned rents and royalties are taxable to the assignee and not to the assignor." *Nelson* v. *Ferguson*, 56 Fed. (2d) 121; *Julius E. Lilienfeld*, 35 B. T. A. 391; *Fontaine Fox*, 37 B. T. A. 271; *Estate of Henry N. Brinsmade*, 39 B. T. A. 195; and *George O. Knapp*, 40 B. T. A. 1144; petitioner relies especially on *Nelson* v. *Ferguson, supra.* In all of these cases the taxpayers actually effected assignments. In view of the conclusion that subparagraphs (a), (b), and (c) did not effect a legal or equitable assignment of any interest in petitioner's patent property or license agreements or even in the royalties to be derived therefrom, these cases are obviously inapplicable.

Both parties cite *Thomas* v. *Perkins*, 301 U. S. 655. In the *Perkins* case the owners of certain oil and gas leases on undeveloped lands providing for a royalty of one-eighth assigned the leases to the taxpayer. The assignment provided for the payment to the assignors of $395,000, to be paid out of one-fourth of the oil produced from the lands and to be paid directly to the assignors by the purchasers of the oil produced from the lands. Thereafter taxpayer produced oil from the lands. The purchasers of the oil made payments directly and proportionately to the assignors, to the taxpayer, and to the owner of the royalty reserved in the lease. The Supreme Court held that the assignors had reserved an "economic interest" in the oil in place and that the sums paid to the assignors by the purchasers of the oil should be excluded from the taxpayer's gross income. Since the situation present in the *Perkins* case is essentially different from the situation present here, the principles enunciated in the *Perkins* case are not considered applicable here. Cf. *Anderson* v. *Helvering, supra.*

Petitioner contends that, even if the amounts which it paid to the stockholders' committee in the taxable years under subparagraphs (a), (b), and (c) are not to be excluded from its taxable income, it is entitled to deduct such amounts in the taxable years as ordinary and necessary expenses paid during those years in carrying on its business under section 23 (a) of the Revenue Acts of 1934 and 1936, the pertinent provisions of which are set forth in the margin.[1] On its income tax returns for the years 1934 and 1935 petitioner deducted the amounts which it paid to the stockholders' committee under sub-

---

[1] SEC. 23. DEDUCTIONS FROM GROSS INCOME.

In computing net income there shall be allowed as deductions:

(a) EXPENSES.—All the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business; including a reasonable allowance for salaries or other compensation for personal services actually rendered; traveling expenses (including the entire amount expended for meals and lodging) while away from home in the pursuit of a trade or business; and rentals or other payments required to be made as a condition to the continued use or possession, for the purposes of the trade or business, of property to which the taxpayer has not taken or is not taking title or in which he has no equity.

paragraphs (a), (b), and (c) as royalties paid, and on its income tax return for the year 1936 petitioner excluded the amounts which it paid to the stockholders' committee under subparagraphs (a), (b), and (c) from its taxable income. In the statement attached to the deficiency notice respondent determined that the payments which petitioner made to the stockholders' committee in the taxable years under subparagraphs (a), (b), and (c) constituted distributions of profits and as such were not proper deductions from taxable income.

Respondent's determination that the amounts which petitioner paid to the stockholders' committee in the taxable years under subparagraphs (a), (b), and (c) were not proper deductions must be sustained. Even though the stock of petitioner was held in escrow during the taxable years, the oil companies had the right to vote the stock and were in substance the sole stockholders of petitioner. *Ruphane B. Iverson*, 29 B. T. A. 863. The payments under subparagraphs (a), (b), and (c) were made by petitioner for the benefit of its sole stockholders, the oil companies, and benefited the oil companies in proportion to their interests in the stock of petitioner. *Ruphane B. Iverson, supra; Security First National Bank of Los Angeles et al., Executors*, 28 B. T. A. 289; *L. J. Christopher*, 13 B. T. A. 729; affd., 55 Fed. (2d) 527. Thus, the payments under subparagraphs (a), (b), and (c) constituted constructive distributions from petitioner to its sole stockholders, the oil companies. *Ruphane B. Iverson, supra; Security First National Bank of Los Angeles et al., Executors, supra; L. J. Christopher, supra*. Respondent determined that the distributions were paid out of profits, and petitioner introduced no evidence to show that the distributions were not so paid. Cf. *Ruphane B. Iverson, supra; L. J. Christopher, supra*. Therefore, in the final analysis, the payments under subparagraphs (a), (b), and (c) constituted constructive dividends from petitioner to its stockholders, the oil companies. *Ruphane B. Iverson, supra; Security First National Bank of Los Angeles et al., Executors, supra; L. J. Christopher, supra*. It should be noted that the payments which petitioner made to the stockholders' committee under subparagraph (d) of paragraph 27 of the agreement were treated by the oil companies as dividends which had been received constructively by them from the petitioner. The payments under subparagraphs (a), (b), and (c) should likewise be treated as dividends constructively received by the oil companies from the petitioner. It follows that respondent correctly determined that the payments under subparagraphs (a), (b), and (c) were not proper deductions from petitioner's taxable income.

The cases which petitioner has cited in support of its contention that the payments under subparagraphs (a), (b), and (c) are deductible as ordinary and necessary business expenses are distinguishable.

In *Louis C. Rollo*, 20 B. T. A. 799, the making of the monthly payments there in question by the transferor corporation "was a definite condition without which the corporation could have no receipts." *Grey Bull Corporation*, 27 B. T. A. 853; *Walter T. Gudeon*, 32 B. T. A. 100; and *Richard P. Hallowell, 2nd*, 39 B. T. A. 50, deal solely with questions of inclusion in taxable income, and not with questions of deduction from taxable income.

*Decision will be entered for the respondent.*