AMELIA J. TAYLOR, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 54131. Filed November 27, 1956.

*I. Newton Brozan, Esq.*, and *Aaron Holman, Esq.*, for the petitioner.
*William G. O'Neill, Esq.*, for the respondent.

364

RICE, *Judge:* The principal issue to be decided herein is whether petitioner is taxable upon the income of various commodity trading accounts which she maintained in the names of three relatives during the years 1946 and 1947.

Petitioner contends that each of these accounts was owned by the person in whose name it had been established, that she simply acted as their agent, and that she is not taxable on the income therefrom since her only function was that of manager of the accounts. She argues that the various cash advances which she made in order to establish the accounts, and later, to increase the volume of trading being conducted in the accounts, constituted loans to the individuals in whose names the accounts had been established, and that such individuals were the beneficial owners of the accounts. After careful study of the record, however, we are not convinced that petitioner's relatives can be regarded as having contributed any capital to the accounts which would justify attributing all or part of the profits to them rather than to petitioner. See *Clay H. Brock*, 22 T. C. 284 (1954). It is our opinion that the purported loans to petitioner's relatives did not create bona fide obligations, that petitioner not only contributed the initial capital but the capital investments in the accounts continued to be hers, and that her dominion and control over each of the accounts was such that the income therefrom must be taxable to her.

There was no written agreement between the parties. In fact, there appears to have been merely a vague understanding that petitioner was expressing her love for her relatives by establishing these accounts and that they would, in some manner, profit thereby. The relatives appear to have known little, if anything, about trading in commodities, and they had no participation whatsoever in the conduct of the accounts. Their concept of the situation was that their aunt was doing them a favor and they felt that they were not in a position to ask questions or make suggestions. Thus, William explained that although he had received periodic statements from the broker showing profits from the various trades conducted in the accounts maintained in his name, he did not report the net profit from such accounts on his return for 1946 because he hesitated to ask his aunt about it.

Petitioner, herself, has made it quite clear that, although her nieces and nephew were nominally the owners of these accounts, it was her intention to maintain complete control over the accounts until she had built them up to a point where there was a $100,000 profit in each, and only at that time did she intend to transfer the accounts to them. The extent of petitioner's control over the accounts, and her intention that the nominal owners were not to acquire a fixed

right to them until the $100,000 objective had been reached, is evidenced by the fact that petitioner made withdrawals at will, even withdrawing amounts in excess of her total advances to the accounts. Although she had withdrawn out of the profits in the Roberta Taylor account some $10,200 more than she had advanced to it, this sum had not been repaid to Roberta Taylor 8 years after the account had been closed.

The fact that the Newcombes included the profits from the accounts on their income tax returns for 1947, that funds from the accounts were used to pay their tax for that year and also had been used to purchase stock in the name of William at a cost of $1,424, and that they paid petitioner $100 in "interest" on these purported loans fails to convince us that they are to be regarded as the true owners of the accounts for income tax purposes. The placing of legal title to property in the name of another does not, of itself, control the determination as to the ownership of the income of the property. *David J. Pleason*, 22 T. C. 361 (1954), affd. 226 F. 2d 732 (C. A. 7, 1955), certiorari denied 350 U. S. 1006 (1956). In order for the income from such property to be taxable to the nominal owner, it must be clear that the parties *intended* that such owner, even though not actually involved in the management of the property, have the right to demand the income or the property itself should he so wish. Here there was complete subservience on the part of the nominal owners and they appear to have been completely dependent upon their aunt for a decision as to when income from the accounts would be distributed to them. Whatever petitioner's intentions regarding the taxation and ultimate ownership of the accounts may have been, it is clear that she retained control over them during the years in issue and had no intention of relinquishing such control during these years. It was petitioner's capital, effort, and constant attention to the accounts that was responsible for the income in question, and until such time as she would, in fact, transfer the accounts to the nominal owners, the income is taxable to her.

Petitioner contends that the notes given her by the Newcombes evidence loans which she had made to them in the operation of the accounts and that, therefore, it was their capital which earned the income in issue. However, the repayment of such alleged loans appears to have been conditional upon the profitable management of the accounts. When a sharp break in the commodity markets caused the accounts to be wiped out, petitioner made no effort to enforce the collection of these purported loans. The testimony of the Newcombes regarding the notes which they gave to petitioner fails to convince us that they truly regarded themselves as debtors with a fixed obligation to repay the amounts advanced by petitioner. Petitioner, herself, testified that she did not expect the loans to be repaid. A valid loan does not exist where there is a conditional obligation to repay. See

*William Francis Mercil,* 24 T. C. 1150 (1955). Accordingly, we must view the sums of cash deposited in these accounts as petitioner's capital rather than her relatives'.

Moreover, the record indicates that on January 14, 1947, petitioner withdrew $7,043.62 from William's account although her total prior advances to such account had been but $2,000. We must assume that sufficient profits had been earned on this $2,000 investment to permit so substantial a withdrawal. Under petitioner's theory, these profits would belong to William and this withdrawal would leave her indebted to him in the amount of $5,043.62. Yet, when on September 3 and 11 of that year she made additional deposits of $1,500 and $10,000, respectively, in that account, William gave his aunt notes for $1,500 and $10,000. If he and his aunt truly regarded the accounts in his name, and the profits thereon as his own, surely they would have deducted this $5,043.62 from the notes given for the subsequent deposits. These notes were mere tokens to lend form to the transaction, and in the final analysis, petitioner never relinquished control over her capital investments in the accounts.

The powers of attorney which each of the three relatives gave to petitioner to enable her to establish and conduct trading in accounts in their names specified that they were liable to the broker for losses or debit balances due on the accounts. However, though the nominal owners may have thus incurred a contingent liability with regard to the accounts, petitioner's conduct indicates that she regarded them as her own and accordingly she is taxable on the profits therefrom.

Petitioner relies strongly on our opinion in *Clay H. Brock, supra.* In that case, the taxpayer had entered into agreements with certain relatives to conduct commodity trading accounts in their names, with the understanding that the profits would be divided equally. All amounts required for the operation of the accounts were to be contributed by the taxpayer and he was to bear the loss if such amounts were lost. We held that the taxpayer was accountable in full for the profits derived from the capital furnished by him, but, that to the extent that profits were allowed to remain in the accounts and be reinvested, such amounts represented additional capital contributed by the taxpayer and the relatives. Subsequent profits derived from such additional capital were held to be chargeable to the taxpayer and the relatives in accordance with their respective interests in such subsequent profits. The basis of our decision in the *Brock* case was the existence of a definite contract between the parties specifying the manner in which funds were to be supplied, profits divided and, most important, giving the nominal owners of the accounts the right to receive and withdraw profits. In fact, with the exception of one of the accounts involved in that case, the taxpayer therein had no power to withdraw funds from the accounts, and he at no time made

withdrawals from the one account where he was empowered to do so. All withdrawals were made by the nominal owners of the accounts and they shared parts of such withdrawals with the taxpayer who was managing their accounts.

In the instant case, there was no such contract with clearly definable terms. The three relatives appeared to have regarded themselves more as ultimate beneficiaries of a gift rather than as the owners of the accounts. They felt that they were in no position to influence petitioner in the conduct of the accounts and not entitled to demand the profits until such time as petitioner desired to have them distributed. Clearly, this situation is substantially different from that in *Clay H. Brock, supra.*

The facts of this case show merely an intent at some future time (when the accounts reached a certain figure) to make a gift thereof to the three relatives, and, until that time arrived, the property was, for tax purposes, that of the petitioner, and income therefrom was properly taxable to her.

The next question to be decided is whether petitioner is entitled to receive, under section 3801 of the 1939 Code, a credit against the deficiency determined for 1947 because of the taxes which the Newcombes paid when they reported on their returns for that year the profits in the commodity accounts maintained in their names. Since the Newcombes did not have the funds to pay the taxes due on the $68,180.25 profit which they included on their returns, they requested petitioner to have the broker issue them its checks for the required amounts. At petitioner's direction, two checks aggregating $33,571.96 were sent to them by the broker for their Federal income taxes and charged to the accounts maintained in their names.

Petitioner contends that the circumstances of this case come within the following provisions of section 3801 (b) (1):

SEC. 3801. MITIGATION OF EFFECT OF LIMITATION AND OTHER PROVISIONS IN INCOME TAX CASES.

(b) CIRCUMSTANCES OF ADJUSTMENT.—When a determination under the income tax laws—

(1) Requires the inclusion in gross income of an item which was erroneously included in the gross income of the taxpayer for another taxable year or in the gross income of a related taxpayer; * * *

\*    \*    \*    \*    \*    \*    \*

and, on the date the determination becomes final, correction of the effect of the error is prevented by the operation * * * of any provision of the internal-revenue laws other than this section * * * then the effect of the error shall be corrected by an adjustment made under this section. * * *

Although this section clearly appears to have been intended to prevent the double taxation of some item of income, we are unable to

find that petitioner and the Newcombes qualify as "related taxpayers" as defined in section 3801 (a) (3), which reads as follows:

(a) DEFINITIONS.—For the purpose of this section—

\* \* \* \* \* \* \*

(3) RELATED TAXPAYER.—The term "related taxpayer" means a taxpayer who, with the taxpayer with respect to whom a determination specified in subsection (b) (1), (2), (3), or (4) is made, stood, in the taxable year with respect to which the erroneous inclusion, exclusion, omission, allowance, or disallowance therein referred to was made, in one of the following relationships: (A) husband and wife; (B) grantor and fiduciary; (C) grantor and beneficiary; (D) fiduciary and beneficiary, legatee, or heir; (E) decedent and decedent's estate; or (F) partner.

Petitioner argues that her relationship with the Newcombes should be regarded as either "grantor and beneficiary" or as that of "fiduciary and beneficiary." However, this presupposes that the dealings between the parties had given rise to a trust and we are unable to find that this occurred. Even if we were to regard the Newcombes as having borrowed money from petitioner and given it to her to invest on their account, this would not give rise to a trust relationship but, rather, that of principal and agent. *In re Arons' Estate*, 121 N. Y. S. 2d 512 (1953); 3 Scott, Trusts, sec. 227.15. The powers of attorney which the Newcombes gave to petitioner to permit her to conduct the commodities accounts in their names simply created an agency relationship. Although an agent may occupy a fiduciary relationship to the principal, without the transfer of legal title to the property, the relationship does not transcend that of agency and the principal may not be termed a beneficiary. See *John M. Aufiero*, 43 B. T. A. 753 (1941). Although this result may appear harsh, we are bound by the specific enumeration of related taxpayers which Congress has seen fit to designate as entitled to relief under section 3801.

An examination of the legislative history of section 3801 (a) (3) discloses that, as originally proposed for enactment into law as part of the Revenue Act of 1938,[3] the definition of related taxpayer included the following additional categories: "(G) assignor and assignee; (H) donor and donee; (I) lessor and lessee; or (J) claimants to ownership of the same property or income." Each of these categories was eliminated by the Conference Committee before enactment of the bill and the House Conference Report merely states that these categories "are eliminated as independent categories of related taxpayers." It appears that the definition of "related taxpayer" contained in section 3801 (a) (3) was inserted to extend the benefits thereof (among others) to certain relationships existing under State law, such as trusts and family partnerships, even though their validity would not be recognized for Federal income tax purposes. *Lovering* v.

---

[3] This appears as section 819 (a) (2) of H. R. 9682, 75th Cong., 3d Sess.

*United States*, 49 F. Supp. 1 (D. Mass., 1943); I. T. 3986, 1949–2 C. B. 108. Since a trust relationship in the instant situation did not exist under the law of New York, *In re Arons' Estate, supra*, petitioner must be denied the benefit of section 3801.

The third issue relates to the $100 purported payment of interest which was made to petitioner by Pauline in 1947. Since we have found that the amounts advanced by petitioner for the operation of the accounts did not constitute bona fide loans, this $100 was not properly reportable by petitioner as interest income on her return for 1947.

In preparing petitioner's return for 1947, petitioner's accountant failed to fill out the alternative tax schedule, thus showing a larger tax than would have been payable had such schedule been completed. Under section 117 (c) (2) of the 1939 Code,[4] a taxpayer whose net long-term capital gains exceed his short-term capital losses is entitled, as a matter of right, to the benefit of the alternative computation provided for in such section. This benefit is not lost by reason of the failure to fill out a schedule, as it would be in the case of an election. Accordingly, petitioner's tax for 1947 shall, under a Rule 50 computation, be computed pursuant to section 117 (c) (2).

*Decision will be entered under Rule 50.*

---

[4] SEC. 117. CAPITAL GAINS AND LOSSES.

(c) ALTERNATIVE TAXES.—

\* \* \* \* \* \* \*

(2) OTHER TAXPAYERS.—If for any taxable year the net long-term capital gain of any taxpayer (other than a corporation) exceeds the net short-term capital loss, there shall be levied, collected, and paid, in lieu of the tax imposed by sections 11 and 12, a tax determined as follows, if and only if such tax is less than the tax imposed by such sections:

A partial tax shall first be computed upon the net income reduced by the amount of such excess, at the rates and in the manner as if this subsection had not been enacted, and the total tax shall be the partial tax plus 50 per centum of such excess.