OPINION. Oppek, Judge: It is difficult to subscribe to petitioner’s theory that the gains in controversy were income generated by income-producing property. The parties are evidently in agreement that the income is capital gain and it seems to us inescapable that this must have arisen out of the sale made by petitioners before they transferred its proceeds. Ordinarily, the gain would then have been taxable to them, cf. John W. Chamberlin, 32 T.C. 1098 (1959), affd. 286 F. 2d 850 (C.A. 7, 1961), certiorari denied 368 U.S. 820 (1961), but if for some reason, as is agreed by the parties here, the tax can be postponed,[1] as, for example, because of the absence of an ascertainable fair market value for the property received, see Burnet v. Logan, 283 U.S. 404 (1931), that does no more than postpone the time and perhaps fix the amount. It should not change the taxpayer whose activity created the profit, Lucas v. Earl, 281 U.S. 111 (1930); Helvering v. Eubank, 311 U.S. [122 (1940); Commissioner v. First State Bank, 168 F. 2d 1004 (C.A. 5, 1948), certiorari denied 335 U.S. 867, and to whom the profit is consequently taxable.[2] United States v. Joliet & Chicago R. Co., 315 U.S. 44 (1942); Commissioner v. Court Holding Co., 324 U.S. 331 (1945); Griffith v. Commissioner, 308 U.S. 355 (1939); F. E. McGillick Co., 30 T.C. 1130, 1148 (1958), reversed other grounds 278 F. 2d 643 (C.A. 3, 1960). In Cold Metal Process Co., 25 T.C. 1333 (1956), affirmed this issue 247 F. 2d 864 (C.A. 6, 1957), we pointed out the factor distinguishing this case from ostensibly similar cases which look solely to the subject matter transferred and not to the transaction giving rise to it. The case of Commissioner v. Court Holding Co., 324 U.S. 331 (1945), cited by respondent, is clearly distinguishable. Here there was no sale of anything, and hence there were no proceeds of a sale arranged by Cold Metal to be attributable to that corporation. Cold Metal Process Co., supra at 1352. A sale is again lacking in the case of Blair v. Commissioner, 300 U.S. 5 (1937), also cited by petitioners. The parties characterized their own transaction as a sale, paragraphs III (2) and (3) of the agreement constituting part of the sale proceeds. This is illustrated by the following extract from those paragraphs: (2) The "balance of the purchase price to be the sum of One Million Seven Hundred Thousand Dollars ($1,700,000) without interest, provided, however, that the obligation to pay such balance of said purchase price shall be an obligation to pay only such portion of said $1,700,000 as is equal to seventy-five per cent of the net income of Eolley, from October 1, 1955, to and including December 31, 1960 * * * but in no event shall said balance be an amount in excess of One Million Seven Hundred Thousand Dollars ($1,700,000). * * * (3) All payments received by Crocker for the account of Sellers * * ⅞ shall be paid over immediately to Sellers * * *. [S]uch payments shall be made in the following manner, to-wit: Dividends from Eolley to Botany shall be delivered * * * to Crocher and Crocher shall hold such dividends and deliver them to Botany upon receipt by Crocher of a certified chech from Botany for the account of Sellers in the amount due Sellers as provided for in Paragraph III(⅞) of this Agreement. [Emphasis added.] Following tbe sale, petitioners did not have a right to Holley’s subsequent income. See Gray Process Corporation, 43 B.T.A. 624, 633-634 (1941), affirmed per curiam 122 F. 2d 1021 (C.A. 3, 1941). They had a right to collect from Botany an amount up to $1,700,000 to be measured by and limited to a number of dollars equaling 75 percent of Holley’s income for the next 5 years. See Estate of Raymond T. Marshall, 20 T.C. 979 (1953). This is not an income interest in Holley but a claim against Botany, indefinite only as to amount. With many of the foregoing propositions petitioners apparently agree. They say in their brief, for example: In respect to respondent’s analogy of the fruit and tree, petitioners agree that the payments in 1956 and 1957 made pursuant to Paragraphs 111(2) and (3) * * * were the product (the fruit). However they disagree that the Kolley stock was the tree which produced the fruit. Petitioners had parted with all right, title and interest to the Holley stock prior to the 1956 and 1957 payments. The fact is that said payments were the fruit of another tree * * * That other tree seems to us inescapably to have been the sale made by petitioners in 1955. The remaining unpaid portions of the purchase price were purely the balance originally due to petitioners for the transaction they had already completed. That to our mind was the tree and it could no more be transferred after the crystallizing of its tax effects than could the subject matter of the litigation in Helvering v. Eubank, Lucas v. Earl, Commissioner v. Court Holding Co., and Griffith v. Commissioner, all supra, and authorities to the same effect. To be contrasted with this arrangement is the situation presented in Commissioner v. Reece, 233 F. 2d 30 (C.A. 1, 1956), affirming 24 T.C. 187 (1955), and similar cases cited by petitioners, where the court concluded that: In this case Reece was originally the owner of a patentable invention. This capital asset had merely the potentiality of producing income, that is, if the invention were profitably exploited. But he sold his patent rights * * * and thereby received, in substitution a new kind of property interest, a chose in action, a contract right to receive “royalty” payments in the future * * *. [Emphasis added.] Here we have no “substitution” of income-producing property for other income-producing property, but a sale for a sum of money which became the subject of an anticipatory assignment. T. J. Rogers, 15 B.T.A. 638, 640 (1929); Floyd v. Scofield, 193 F. 2d 594, 595 (C.A. 5, 1952); Mrs. Len Langston, 23 B.TA. 991 (1931). The deed ran to the purchaser and title was conveyed to him. Simultaneously with the passing of the title arose the obligation of the vendee to pay. This obligation ran to the vendor, to whom the * * * [first] payment was made. At the instant of the consummation of the sale the obligation of the vendor to pay a taw on any profit derived became fixed. The fact that the vendor directed that the notes * * * be made payable to a third party is immaterial and could not affect or lessen the obligation of the vendor to account for all profits on the transaction. It follows that what was conveyed to the * * * [donees] was a right to collect and retain the deferred payments, but the obligation of the vendor to pay taw on all profits, being fixed at the time of sale, was not reduced by this gift of the unpaid proceeds. [Emphasis added.] T.J. Rogers, supra at 640-641. Having concluded that an assignment of the proceeds of the agreement would not shift to the donees the incidence of taxation upon subsequent receipts, we need not consider the effect of Margery B. Townsend’s power to reinstate the agreement as community property, resulting from the fact that prior to the receipts in question she had not consented in writing to the gift of community property made by petitioner nor waived that requirement.[3] See Roy P. Harper, 6 T.C. 230 (1946). Nor need we consider the effect of the assignment of only a part of the agreement — the right to receive future payments. See Helvering v. Horst, 311 U.S. 112, 119, 120 (1940); Helvering v. Eubank, supra. And, of course, the State court decree, however persuasive as to the passage of title, could not on the present facts affect the incidence of Federal taxation. Kathryn S. Fuller, 37 T.C. 147 (1961); Roy P. Harper, supra. To take account of a clerical error, Decisions will be entered under Rule 50. Respondent stated In bis opening statement at the trial that “these proceeds should be Included In the Income of the Petitioners for our two years under the cost recovery or return * * * [of] capital method of reporting long-term capital gain.” Congress also recognized this basic tax concept in enacting the relief provisions embodied in section 337 of the 1994 Code which, under certain limited conditions, relieves the seller from paying a tax on the gain resulting from a sale. Henry A. Kneheriberg, 35 T.C. 473 (1960), on appeal (C.A. 9,1961), “The husband has the management and control of the community personal property, with like absolute power of disposition * * * as he has of his separate estate; provided, however, that he can not make a gift of such community personal property * * * without the written consent of the wife.” Cal. Civ. Code sec. 172.