ESTATE OF MARGITA APPLESTEIN, DECEASED, LOUIS APPLESTEIN, ADMINISTRATOR, AND LOUIS APPLESTEIN, SURVIVING HUSBAND, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 4788–79.     Filed February 2, 1983.

Louis Applestein, pro se.
*Richard J. Sapinski*, for the respondent.

WILBUR, *Judge*: Respondent determined a deficiency in petitioners' Federal income tax for 1973 in the amount of $19,531.48.[1] The issues presented for our determination are (1) whether petitioners are taxable on the gain reported by their two children from the exchange of National Realty stock transferred to them by petitioner Louis Applestein after the approval of a merger of National Realty Corp. with United

---

[1] Of this amount, $12,578.92 represents the original deficiency determined by respondent in his statutory notice of deficiency, and $6,952.56 represents the additional amount asserted by the respondent in his amended answer.

National Corp. but shortly before its effective date, and (2) whether petitioners are taxable on income derived from certain securities trading by petitioner Louis Applestein in accounts which he set up for his two children.

### FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts and attached exhibits are incorporated herein by this reference.

Petitioners Margita and Louis Applestein filed a timely joint 1973 Federal income tax return with the District Director, Newark, N.J.[2] Petitioner Louis Applestein (hereafter petitioner) resided in Trenton, N.J., at the time of filing the petition herein.

Petitioner is a retired Internal Revenue Service Examination Division Group Manager and a certified public accountant. Since approximately 1950, petitioner has been involved in trading in the stock market and, during 1973 and several years prior thereto, was actively trading in securities through several brokerage firms, including Merrill Lynch, Pierce, Fenner & Smith and Kalb, Voorhis & Co.

Petitioner maintained a number of securities trading accounts with Kalb, Voorhis & Co. during 1973 and prior thereto including a margin account, short account, cash account, special bond account, and convertible bond account.

Petitioner and his late wife had two children, Scott C. Applestein (Scott), born on February 18, 1955, and Sadie S. Applestein (Sadie), born on December 23, 1953. During 1973 and 1974, Scott and Sadie were full-time students and were dependent upon petitioner for support. Sadie was attending college away from home during 1973 while Scott was either a senior in high school or a freshman in college during that year.

Prior to February 1973, Scott and Sadie both owned outright a number of securities which were acquired by gift during their childhood years, mostly from their grandparents. As of December 31, 1972, Scott owned outright the following securities:

---

[2]Petitioner Margita Applestein died during 1973. Petitioner Louis Applestein duly qualified as administrator of his late wife's estate and was issued letters of administration by the Mercer County Surrogate's Court on May 31, 1974.

| Number/ denomination | Security | Date acquired |
|---|---|---|
| 400 | National Realty Corp. | Dec. 1972 |
| 100 | U.S. Hoffman Machinery Corp. Pfd. | Mar. 1957 - Nov. 1958 |
| $5,000 | Gulf & Western 6/88 | Oct. 1968 |
| $4,000 | McCrory Corp. 5/81 | Apr. 1966 |
| 500 | Offshore Sea Development Co. | Apr. 1969 |
| 100 | Lykes, Youngstown 2.50 Ser. A. Pfd. | May 1969 |
| $3,000 | Southdown Notes | May 1970 |
| $2,000 | Gulf, Mobile & Ohio 5% | Mar. 1959 |
| $4,000 | Gulf, Mobile & Ohio 5% | July 1960 |
| 100 | Chesapeake & Ohio RR (Chessie System) | Dec. 1961 |
| 86 | First National State Bancorp. | Unknown |
| 61 | Gulf & Western Ser. A. 1.75 Pfd. | Jan. 1964 |
| 400 | United National Corp. Pfd. | July 1972 |

As of December 31, 1972, Sadie owned outright the following securities:

| Number/ denomination | Stock or security | Date acquired |
|---|---|---|
| 400 | National Realty Corp. | Dec. 1972 |
| $3,000 | McCrory Corp. 5/81 | Apr. 1966 |
| 500 | Offshore Sea Development Co. | Apr. 1969 |
| $12,400 | Wean United | Feb. 1969 |
| $2,000 | Gulf, Mobile & Ohio 5% | Mar. 1959 |
| $4,000 | Gulf, Mobile & Ohio 5% | July 1960 |
| 100 | Chesapeake & Ohio RR (Chessie System) | Dec. 1961 |
| 100 | U.S. Hoffman Corp. Pfd. | Mar. 1957 - Nov. 1958 |
| 84 | U.S.M. Corp. | Dec. 1957 - July 1963 |
| 18 | Katy Ind. Pfd. Cl. B. 1.46 Ser. | Unknown |
| 86 | First National State Bancorp. | Unknown |
| 69 | Gulf & Western Ser. A. 1.75 Pfd. | Jan. 1964 |
| $5,000 | Gulf & Western 6/88 | Oct. 1968 |
| 200 | United National Corp. Pfd. | July 1972 |

During 1972, petitioner established brokerage accounts at Kalb, Voorhis & Co. for Scott and Sadie and designated himself custodian of the securities therein under the provi-

sions of the New Jersey Uniform Gifts to Minors Act, N.J. Stat. Ann. sec. 46:38–13 et seq. (West Supp. 1981).

As of January 1, 1973, the following securities and stocks previously owned outright by the children had been transferred to the custodial account of Scott and Sadie established by petitioner at Kalb, Voorhis & Co:

*Scott C. Applestein*

$5,000 ........ Gulf & Western 6/88
$4,000 ........ McCrory Corp. 5/81
   100 ........ Lykes, Youngstown Corp. 2.50 Ser. A/Pfd.
   400 ........ United National Corp. Pfd.

*Sadie S. Applestein*

$3,000 ........ McCrory Co. 5/81
$5,000 ........ Gulf & Western 6/88
$12,400 ........ Wean United
   200 ........ United National Corp. Pfd.

These securities were among those owned by Scott and Sadie as of December 31, 1972.

Petitioner, an experienced stock trader, purchases securities on a short-term basis, primarily looking for a merger or tender offer situation where he may realize a profit on the differential between the market and offering price for the particular stock in question. Petitioner reads Value Line and the Wall Street Journal to obtain the information upon which he makes his decisions to buy and sell securities. In addition, petitioner considers the "track record" of the particular company on takeovers in making such decisions.

On December 26, 1972, United National Corp. (United National) and National Realty Corp. (National Realty) entered into an agreement whereby it was proposed, subject to shareholder approval, that National Realty be merged into United National. On December 29, 1972, a proxy statement describing the terms of the proposed merger was sent to the shareholders of both National Realty and United National. The statement advised shareholders of both United National and National Realty of a special shareholder meeting on February 7, 1973, where the shareholders would be called upon to approve the merger. The statement provided that "If the shareholders of both United [United National] and the Trust [National Realty] take favorable actions at their meetings on February 7, 1973, it is expected that the Merger will be

made effective on or before February 28, 1973." The terms of the merger were also set out in the statement. In exchange for 1 share of National Realty, shareholders of National Realty would receive (upon the effective date of the merger) a one-fifth share of United National common, a 5-year warrant to purchase 1 share of United National common at $10 per share, and $5.50 principal amount of a 7½-percent 15 par subordinated sinking fund debenture. The proxy statement also set out the Federal tax consequences of the transaction:

> For Federal income tax purposes, the merger will be treated as a sale of the corporate properties of the Trust to United, followed by a complete liquidation of the Trust. No gain or loss will be recognized by the Trust on the transfer of its assets by virtue of Section 337 of the Internal Revenue Code, and United will take as a basis for the properties acquired the value of the common stock, warrants and debentures paid for these properties.
>
> The merger will not constitute a reorganization within the meaning of the provisions of Section 368(a)(1) of the Internal Revenue Code, and gain or loss will be recognized by the holders of the shares of beneficial interest in the Trust on the exchange of such shares for the common stock, warrants and debentures of United. The amount of such gain or loss will be the difference between the amount realized on the exchange and the tax basis for the shares surrendered.

Petitioner was a shareholder of both National Realty and United National during December 1972 and received copies of the proxy statements. On February 7, 1973, the shareholders of both companies approved the merger, with the merger to be effective on February 28, 1973.

As of December 26, 1972, petitioner owned 48,300 shares of National Realty, approximately 3 percent of its total outstanding stock. In late December of 1972 and in January and February of 1973, petitioner purchased 18,800 additional shares of National Realty. On February 21, 27, and 28, petitioner transferred a total of 10,800 shares of National Realty stock to each of his two children's custodial accounts at Kalb, Voorhis & Co. from his own margin account with that broker. Most of the shares transferred were purchased by the petitioner in late December of 1972 and in January and February of 1973. The following chart indicates the market price of the transferred shares when purchased by petitioner and when transferred to Scott and Sadie.

SHARES TRANSFERRED TO SCOTT

| Date transferred | Number of shares | Market range on transfer date | Date purchased by petitioner | Market price |
|---|---|---|---|---|
| 2/21/73 | 100 | $5\frac{1}{4}$ - $5\frac{1}{2}$ | 2/ 6/73 | $4\frac{5}{8}$ |
| 2/21/73 | 300 | $5\frac{1}{4}$ - $5\frac{1}{2}$ | 12/29/72 | $4\frac{3}{4}$ |
| 2/21/73 | 2,000 | $5\frac{1}{4}$ - $5\frac{1}{2}$ | 12/29/72 | $4\frac{5}{8}$ |
| 2/27/73 | 200 | $5\frac{1}{4}$ - $5\frac{1}{2}$ | 12/29/72 | $4\frac{3}{4}$ |
| 2/27/73 | 500 | $5\frac{1}{4}$ - $5\frac{5}{8}$ | 12/22/72 | $4\frac{3}{4}$ |
| 2/27/73 | 3,500 | $5\frac{1}{4}$ - $5\frac{5}{8}$ | 12/22/72 | $4\frac{7}{8}$ |
| 2/27/73 | 700 | $5\frac{1}{4}$ - $5\frac{5}{8}$ | 12/21/72 | $4\frac{3}{4}$ |
| 2/27/73 | 100 | $5\frac{1}{4}$ - $5\frac{5}{8}$ | 12/20/72 | $4\frac{3}{4}$ |
| 2/28/73 | 1,900 | $5\frac{1}{2}$ - $5\frac{5}{8}$ | 12/18/72 | $4\frac{3}{4}$ |
| 2/28/73 | 1,500 | $5\frac{1}{2}$ - $5\frac{5}{8}$ | 2/20/73 | $5\frac{1}{8}$ |
|  | 10,800 |  |  |  |

SHARES TRANSFERRED TO SADIE

| Date transferred | Number of shares | Market range on transfer date | Date purchased by petitioner | Market price |
|---|---|---|---|---|
| 2/21/73 | 2,400 | $5\frac{1}{4}$ - $5\frac{1}{2}$ | 2/ 6/73 | $4\frac{5}{8}$ |
| 2/27/73 | 1,000 | $5\frac{1}{4}$ - $5\frac{5}{8}$ | 12/20/72 | $4\frac{3}{4}$ |
| 2/27/73 | 1,900 | $5\frac{1}{4}$ - $5\frac{5}{8}$ | 12/19/72 | $4\frac{3}{4}$ |
| 2/27/73 | 2,100 | $5\frac{1}{4}$ - $5\frac{5}{8}$ | 12/18/72 | $4\frac{3}{4}$ |
| 2/28/73 | 2,500 | $5\frac{1}{2}$ - $5\frac{5}{8}$ | 12/14/72 | $4\frac{7}{8}$ |
| 2/28/73 | 800 | $5\frac{1}{2}$ - $5\frac{5}{8}$ | 9/22/72 | $5\frac{1}{4}$ |
| 2/28/73 | 100 | $5\frac{1}{2}$ - $5\frac{5}{8}$ | 2/20/72 | $5\frac{1}{8}$ |
|  | 10,800 |  |  |  |

Petitioner's cost for the 10,800 shares of National Realty transferred to each of his two children was $52,989.27. Petitioner characterized the transfer of the National Realty stock as a sale at cost ($52,989.27) to each of his children and loaned the full amount of the purchase price to the children. Scott and Sadie each executed a series of demand notes at 6-percent interest for the full amount of the purchase.

The gain realized with respect to the transfer of the 10,800 shares held in the custodial accounts of Scott and Sadie was reported on the children's 1973 income tax returns. Respondent, in his notice of deficiency, determined that petitioner is properly taxable on such gain. However, respondent has conceded that the gain represented by the exchange of 400 shares of National Realty which petitioner transferred to each of the children in December 1972 was taxable to the children. The proper amount of such gain was $335.52 for each of the children.

Petitioner thereafter during 1973 made further purchases of securities in the two custodial accounts. Petitioner provided any funds necessary to effect the purchase in the form of margin credits or cash transferred from his own trading accounts and those of his brother and father (which he managed) at Kalb, Voorhis & Co. Funds were transferred from petitioner's account to the children's accounts by petitioner's verbal directions to the broker to "charge my account." Petitioner treated the funds transferred as additional advances to the two children and the advances were added to the balance already due from each child on the transfer of the National Realty stock. Petitioner also added a 6-percent monthly interest charge to the outstanding advance balance. However, no notes or other evidence of indebtedness was given with respect to any of these funds advanced. No funds changed hands between petitioner and his children with respect to the proceeds and the "interest." The only document reflecting these transactions was a bookkeeping sheet on which petitioner recorded the amounts his children owed to him.

The securities were placed in custodial accounts at the suggestion of petitioner's broker since the children were both under 21 and minors under New York law. Thus, "nondiscretionary accounts" were opened whereby the brokerage firm (Kalb, Voorhis & Co.) would buy and sell securities for these accounts only on the instructions of the custodian. When Scott and Sadie reached the age of 21, the accounts were changed to their names individually. Petitioner then ceased acting as custodian but continued to do all trading in the accounts pursuant to powers of attorney.

When petitioner sold securities in his children's custodial accounts, the proceeds of any such sales were usually used to reduce the balance due to petitioner individually on the advances he made. Petitioner also treated interest and dividend income from the stocks in the children's accounts as reducing the outstanding balance due him. While petitioner formally treated the sales proceeds as loan repayments, he generally used them to fund additional stock purchases for the children's accounts, using the same arrangement heretofore described to record the additional amount the children owed him.

The following chart sets forth the securities which petitioner

purchased and sold for his own account and those which he purchased and sold for his children's accounts in 1973 and the gain or loss reported by petitioner, Scott, and Sadie on their respective 1973 Federal income tax returns.

| Account | Number of shares | Date purchased | Date sold | Gain or loss (short/long term) |
|---------|---------|---------|---------|---------|
| National Realty | | | | |
| Petitioner | 4,000 | 8/72 | 3/73 | $1,519.24(LT) |
| Petitioner | 41,500 | 12/72 - 3/73 | 3/73 | 21,507.40(ST) |
| Scott | 11,200 | 12/72 - 2/73 | 3/73 | 7,268.20(ST) |
| Sadie | 11,200 | 12/72 - 2/73 | 3/73 | 7,268.20(ST) |
| Total | 67,900 | | | 1,519.24(LT) |
| | | | | 36,043.80(ST) |
| Mercantile Industries | | | | |
| Petitioner | 4,600 | 4/73 | 5/73 | 5,868.03(ST) |
| Scott | 6,100 | 4/73 | 5/73 | 7,412.07(ST) |
| Sadie | 800 | 5/73 | 5/73 | 942.70(ST) |
| Total | 11,500 | | | 14,222.80(ST) |
| National General | | | | |
| Petitioner | 1,500 | 3/73 | 10/73 | 7,068.75(LT) |
| Petitioner | 2,600 | 4/73 - 6/73 | 10/73 | 7,568.10(ST) |
| Scott | 800 | 6/73 | 9/73 | 5,088.32(ST) |
| Sadie | 1,000 | 5/73 | 9/73 | 2,126.72(ST) |
| Sadie | 5,100 | 10/73 | 10/73 | 7,175.48(ST) |
| Total | 11,000 | | | 7,068.75(LT) |
| | | | | 21,958.62(ST) |
| Morrison Knudsen | | | | |
| Scott | 500 | 6/73 | 9/73 | 864.06(ST) |
| United National | | | | |
| Scott | 23,000 | 3/73 | 8/73 | (1,640.33)(ST) |
| Sadie | 23,200 | 3/73 | 8/73 | (1,872.80)(ST) |
| American Financial | | | | |
| Sadie | 10,000 | 9/73 | 12/73 | 171.60(ST) |

| Account | Number of shares | Date purchased | Date sold | Gain or loss (short/long term) |
|---|---|---|---|---|
| | | General Development | | |
| Petitioner | 1,000 | 5/73 | 7/73 | $1,236.87(ST) |
| Sadie | 200 | 5/73 | 7/73 | 257.20(ST) |
| Total | 1,200 | | | 1,494.07(ST) |

As indicated by the above sales, long-term capital gains treatment was attributable only to stock purchased by petitioner in his own behalf. All the gains reported by Scott and Sadie with respect to these stock sales were short term.

On October 11, 1973, petitioner executed a "day trade" in Sadie's custodial account. Petitioner purchased 5,100 shares of National General for $156,016.76 and, later that day, sold those same shares for $163,192.24 and realized a short-term capital gain of $7,175.48 which was reported on Sadie's 1973 Form 1040. Petitioner advanced over $70,000 including his own paycheck from the Internal Revenue Service to assist in completing this transaction. He also authorized Kalb, Voorhis & Co. to transfer certain stocks from his own account to Sadie's account to cover any sales of National General made in her account.

In both April and June of 1973, petitioner had Scott borrow $85,000 and $35,000, respectively, from the Broad Street National Bank. The money was borrowed in Scott's name but petitioner guaranteed the loan, provided the collateral, and was the only person to exercise control over the loan proceeds. Petitioner formally used these loan proceeds to reduce the amount of the children's loan to him. Actually, the loan was used by petitioner to fund further stock purchases. Shortly before each loan was taken out, petitioner purchased stock on his own margin account and used the loan proceeds to pay for the stock.

In November and December 1973, petitioner executed the following securities purchases in the trading account of Abe and Ben Applestein (petitioner's father and brother) at Kalb, Voorhis & Co.

| Date (actual) | Date (per brokerage statement) | Stock | Number of shares |
|---|---|---|---|
| 11/07/73 | 11/14/73 | National General | 50 |
| 11/07/73 | 11/14/73 | National General | 50 |
| 11/07/73 | 11/14/73 | National General | 150 |
| 11/07/73 | 11/14/73 | National General | 100 |
| 11/29/73 | 12/06/73 | National General | 150 |
| 11/06/73 | 11/13/73 | Recrion Corp. | 250 |
| 11/23/73 | 11/30/73 | Grand Union | 2,500 |
| 12/07/73 | 12/14/73 | Airco Corp. | 500 |
| 11/08/73 | 11/15/73 | Helme Products | 50 |
| 11/09/73 | 11/16/73 | Helme Products | 200 |
| 11/09/73 | 11/16/73 | National General Warrants | 250 |
| 11/09/73 | 11/16/73 | National General Warrants | 50 |
| 11/27/73 | 12/04/73 | National General Warrants | 50 |
| 11/27/73 | 12/04/73 | National General Warrants | 100 |
| 11/28/73 | 12/05/73 | National General Warrants | 100 |
| 11/28/73 | 12/05/73 | National General Warrants | 100 |
| 11/28/73 | 12/05/73 | National General Warrants | 100 |
| 11/29/73 | 12/06/73 | National General Warrants | 200 |
| 11/29/73 | 12/06/73 | National General Warrants | 50 |

These securities were funded through the use of available margin credits in that account, and petitioner, who managed the account, considered it a loan from his brother and father. Petitioner treated this transaction as a transfer of the stock to his children and a loan of the purchase price and added this amount to the children's outstanding advance loan balance. These securities, however, do not appear in the children's custodial account statements. In December 1973, petitioner sold some of the securities in Abe and Ben's account, and Scott and Sadie each reported the gain therefrom on their Federal income tax returns as follows:

| Stock | Shares | Date purchased | Price | Date sold | Price | STCG |
|---|---|---|---|---|---|---|
| Grand Union | 2,500 | 11/30/73 | $40,392.15 | 12/13/73 | $40,412,67 | $20.52 |
| Airco Corp. | 500 | 11/07/73 | 7,498.48 | 12/14/73 | 8,355.33 | 856.85 |

Respondent determined that petitioner and not the children was properly taxable on all interest, dividends, and capital gains with respect to these stock transactions.

OPINION

1. *Transfer of National Realty Stock Prior to Merger*

At issue herein is the gain reported by Scott and Sadie on the exchange of 10,800 shares of National Realty stock in connection with National Realty's merger into United National. The dates surrounding the merger transactions are crucial in determining whether petitioner should be taxed on the theory that the transfer of the stock constituted an anticipatory assignment of income.

On December 26, 1972, United National and National Realty entered into an agreement whereby National Realty would merge into United National subject to shareholder approval. On December 29, 1972, a proxy statement with respect to the proposed merger was sent to the shareholders of both National Realty and United National advising them of the merger and of a meeting on February 7, 1973, wherein the shareholders would vote on its approval. The terms of the merger were set out in the proxy statement. In exchange for 1 share of National Realty, shareholders of National Realty would be entitled to receive a one-fifth share of United National common, a 5-year warrant to purchase 1 share of United National common at $10 per share, and $5.50 principal amount of a 7½ percent 15-year subordinated sinking fund debenture. On February 7, 1973, the shareholders approved the merger which was to be effective on February 28, 1973. On February 21, 27, and 28, 1973, petitioner transferred "at cost" various shares of National Realty to custodial accounts set up for Scott and Sadie, and the children executed a series of demand notes for such amounts. The children later reported the capital gain with respect to the merger exchange. The issue is whether petitioner, and not the children, must be taxed on such gain.

In claiming that petitioner should be taxed, respondent relies upon the following principle set forth in *Commissioner v. Court Holding Co.*, 324 U.S. 331, 334 (1945).

The incidence of taxation depends upon the substance of a transaction. The tax consequences which arise from gains from a sale of property are not finally to be determined solely by the means employed to transfer legal title. Rather, the transaction must be viewed as a whole, and each step, from the commencement of negotiations to the consummation of the sale, is relevant. A sale by one person cannot be transformed for tax purposes into a sale by

another by using the latter as a conduit through which to pass title. * * * [Fn. ref. omitted.]

Thus, respondent takes the position that in view of the impending merger, petitioner in substance exchanged the stock and realized the gain thereon prior to the transfer. Respondent thus contends that the children were merely used as conduits to pass technical title to the stock and that petitioner should be taxed on the gain. Petitioner's position is simply that since he transferred title of the stock to the children, the children properly reported the gain on the merger exchange.

Resolution of these competing positions hinges on the question whether petitioner should be relieved of taxation since he transferred the underlying property along with the right to receive the income from that property (see *Helvering v. Horst*, 311 U.S. 112 (1940)) or whether petitioner should be taxed on the basis that he had, in effect, "realized" the gain in the value of the merger proceeds prior to the transfer such that the transfer constituted an assignment of only a right to receive the income. Based on the facts herein, we believe that petitioner is liable for the tax and that the transfers of stock were ineffective to shift to the children the tax liability for the gain resulting from the merger exchange.

In similar factual contexts, the courts have held that the transferor of property and not the transferee is taxed since the transferor had effectively realized the income before assigning it. *Jones v. United States*, 531 F.2d 1343 (6th Cir. 1976); *Friedman v. Commissioner*, 346 F.2d 506 (6th Cir. 1965), affg. 41 T.C. 428 (1963); *Smith's Estate v. Commissioner*, 292 F.2d 478 (3d Cir. 1961), affg. 34 T.C. 842 (1960); *Wood Harmon Corp. v. United States*, 311 F.2d 918 (2d Cir. 1963); *Doyle v. Commissioner*, 147 F.2d 769 (4th Cir. 1945); *Allen v. Commissioner*, 66 T.C. 340 (1976); *Usher v. Commissioner*, 45 T.C. 205 (1965); *Townsend v. Commissioner*, 37 T.C. 830 (1962); *Cook v. Commissioner*, 5 T.C. 908 (1945). Such transfers arose primarily in two contexts: (1) Situations similar to that herein involving intrafamily transactions in which high-bracket taxpayers attempted to shift potential income to low-bracket taxpayers (see, e.g., *Smith's Estate v. Commissioner*, *supra*; *Doyle v. Commissioner*, *supra*; *Usher v. Commissioner*, *supra*; *Townsend v. Commissioner*, *supra*; *Cook v. Commissioner*,

*supra*); and (2) situations involving gifts or bargain sales of property to charity where the donor of the property attempted to both secure a charitable deduction for the value of the transfer and relieve himself of the tax on subsequent gains derived from the property. See, e.g., *Jones v. United States, supra*; *Kinsey v. Commissioner*, 477 F.2d 1058 (2d Cir. 1973), affg. 58 T.C. 259 (1972); *Hudspeth v. United States*, 471 F.2d 275 (8th Cir. 1972); *Friedman v. Commissioner, supra*; *Allen v. Commissioner, supra*. In all these cases, the transfers were ineffective to shift the tax burden since the transfer took place after the occurrence of an event which gave rise to a matured right to the income.

The Courts of Appeals have held on various occasions that a gift of stock to a charitable organization following the adoption of a plan of liquidation but prior to the liquidating distribution constitutes an anticipatory assignment of income and results in a recognition of gain to the donor. *Jones v. United States, supra*; *Kinsey v. Commissioner, supra*; *Hudspeth v. United States, supra*. See also *Allen v. Commissioner, supra*. The shareholder's vote to liquidate was sufficient to constitute a severance of the economic gain (i.e., the liquidation proceeds) from the investment (i.e., the stock), and the transaction was viewed in substance as a transfer of the liquidation proceeds. *Jones v. United States, supra* at 1344–1345; *Kinsey v. Commissioner, supra* at 1060–1063; *Hudspeth v. United States, supra* at 279–280. Cf. *Stern v. Commissioner*, 15 T.C. 521 (1950) (transfer made prior to shareholder's vote held to be gift of stock rather than assignment of liquidation proceeds).

Similarly, where the taxpayer made a gift of stock to his sons after the corporation had adopted a resolution to liquidate, we held that the gain on the liquidation proceeds was taxable to the donor. *Cook v. Commissioner*, 5 T.C. 908 (1945). We reasoned that because the vote to liquidate was unanimous, the owner did not transfer his stock in the corporation but merely assigned his right to receive the liquidation proceeds. 5 T.C. at 911–912. We stated (5 T.C. at 912):

> The petitioner well knew that nothing remained to be done except to have the actual proceeds of liquidation distributed among the shareholders. * * * It was thus patently never his intention that his sons should exercise any ownership over the stock, but merely that they should participate in the proceeds of liquidation.

In addition, where the taxpayer entered into a binding contract to sell stock to a third party and then, prior to the actual consummation of the sale, transferred the stock to members of his family or to a trust for their benefit, we held that the taxpayer is taxed on the amount of the gain realized upon the sale. *Usher v. Commissioner*, 45 T.C. 205 (1965); see also *Salvatore v. Commissioner*, 434 F.2d 600 (2d Cir. 1970); *Hallowell v. Commissioner*, 56 T.C. 600 (1971); *Malkan v. Commissioner*, 54 T.C. 1305 (1970); *Townsend v. Commissioner*, 37 T.C. 830 (1962). We stated in *Usher v. Commissioner, supra* at 216:

In our opinion the petitioner Myrtis C. Usher in entering into the binding contract of sale and causing the trust to carry out such contract and use the proceeds in a manner described enjoyed the benefit of such proceeds, including the portion thereof representing capital gain, as completely as she would have had she in form collected the proceeds of the sale and transferred them to the trust to be used as above described. See *Helvering v. Horst*, 311 U.S. 112, and *Helvering v. Eubank*, 311 U.S. 122.

Cf. *Bassett v. Commissioner*, 33 B.T.A. 182 (1935), affd. per curiam 90 F.2d 1004 (2d Cir. 1937) (taxpayer-donor relieved of tax liability where taxpayer had not reached an agreement for sale of stock prior to transfer of stock to trust).

In *Townsend v. Commissioner, supra*, after the taxpayer sold corporate stock for a deferred price measured by future corporate profits, the taxpayer made a gift of the sales contract to members of his family who were to receive the collections under the contract. We held the taxpayer-donor taxable on these collections despite the anticipatory attempt to shift such income to his family. We stated (37 T.C. at 838):

The remaining unpaid portions of the purchase price were purely the balance originally due to petitioners for the transaction they had already completed. *That to our mind was the tree and it could no more be transferred after the crystallizing of its tax effects than could the subject matter of the litigation in Helvering v. Eubank, Lucas v. Earl, Commissioner v. Court Holding Co.*, and *Griffith v. Commissioner*, all *supra*, and authorities to the same effect. [Emphasis added.]

See also *Wood Harmon Corp. v. United States*, 311 F.2d 918 (2d Cir. 1963); *Sheldon v. Commissioner*, 62 T.C. 96 (1974).

Other cases have similarly held that the donor remains liable for the tax on income later received by the donee where the occurrence of a specific event with respect to that property

creates the right to the income at the time of the transfer. *Smith's Estate v. Commissioner*, 292 F.2d 478 (3d Cir. 1961), affg. 34 T.C. 842 (1960) (donor held liable for the tax on dividend declared before stock was transferred to the children); *Doyle v. Commissioner*, 147 F.2d 769 (4th Cir. 1945), affg. 3 T.C. 1092 (1944) (donor held taxable on proceeds of Court of Claims judgment where he transferred interest in such judgment to his wife and children after denial of certiorari by Supreme Court). In such cases, "the fruit had ripened" before the transfer. *Smith's Estate v. Commissioner, supra* at 480; see also *Doyle v. Commissioner, supra* at 771. As is evident from the above, where the right to income has matured at the time of the transfer, the transferor will be taxed notwithstanding the technical transfer of the income-producing property. However, the mere anticipation or expectation of income at the time of the assignment is insufficient to give rise to a fixed right to earned income. *Carborundum Co. v. Commissioner*, 74 T.C. 730 (1980); *S. C. Johnson & Son, Inc. v. Commissioner*, 63 T.C. 778 (1975). After close analysis of the case law and facts herein, we believe that petitioner and not his children should be taxed on the gain derived from the sale of the National Realty shares.

The crucial date is February 7, 1973, when the shareholders of National Realty and United National approved the proposed merger agreement. The terms of the merger were delineated in the proxy statement. Shareholders of National Realty knew that after February 28, 1973, the effective date of the merger, their shares could be exchanged for United National stock, warrants, and debentures. After February 7, the corporate stock was nothing more than a vehicle for receipt of the proceeds as per the merger agreement. On February 21, 27, and 28, when petitioner transferred 10,800 shares of National Realty to each of his children, the effective date of the merger was only a short time away and all items with respect to the merger had been approved and solidified. The stocks transferred were thus hollow receptacles by which the petitioner conveyed the merger proceeds to his children. All the children had to do was to allow the stock to sit in their custodial accounts for a day or two and then hold out their caps to receive the proceeds. As the court stated in *Doyle v. Commissioner, supra* at 772:

They merely had to wait (and that not for long) for the expected benefits to fall (and they did quickly fall) right into their economic laps. They well knew (as did Doyle) that a rare piece of good fortune was "right around the corner" without even the necessity of their going to meet it; or, in a picturesque phrase of the Blue Ridge mountaineers, they could well smile in clear anticipation that "It was about to snow in their hats." .

In sum, the timing of the transfer makes it clear that petitioner's right to the merger proceeds had virtually ripened prior to the transfer and that the transfer of the stock constituted a transfer of the merger proceeds rather than an interest in a viable corporation.[3]

That petitioner classified the transfers of the National Realty stock to his children as a "sale at cost" does not change the result herein.[4] Although the majority of cases dealing with this aspect of the assignment-of-income doctrine involved a *gift* of property to either a charitable organization or a family member, the same principles apply with respect to a bargain sale of property. *Friedman v. Commissioner*, 346 F.2d 506 (6th Cir. 1965), affg. 41 T.C. 428 (1963).

At trial, petitioner mentioned the possibility that the merger, although approved, may still not be consummated. However, like the decisions involving gifts of stock to charity before liquidation, we must view the "realities and substance" of events to determine whether, by the time the transfer of stock occurs, "the liquidation plan was practically certain to be completed despite the remote and hypothetical possibility of abandonment." *Jones v. United States*, 531 F.2d 1343, 1346 (6th Cir. 1976). In the instant case, at the time of transfer, the merger had been agreed upon by the directors and shareholders of both companies and there were no other necessary steps

---

[3]Respondent's theory for taxing the petitioner on the merger proceeds is that since petitioner orchestrated the entire transaction and transferred the stock after the merger vote, the petitioner in substance exchanged the stock and merely transferred the proceeds to the children. See *Commissioner v. Court Holding Co.*, 324 U.S. 331 (1945); *Hallowell v. Commissioner*, 56 T.C. 600 (1971); *Malkan v. Commissioner*, 54 T.C. 1305 (1970); *Usher v. Commissioner*, 45 T.C. 205 (1965). Thus, respondent's argument is essentially one of "substance over form." We prefer, however, to rest our decision on the assignment-of-income doctrine although "In fact, one might think of assignment doctrine as a part of the substance-over-form principle." See Lyons & Eustice, "Assignment of Income: Fruit and Tree as Irrigated by the P. G. Lake Case," 17 Tax L. Rev. 295, 300(1962).

[4]Petitioner purchased the shares transferred at prices ranging between $4\frac{3}{4}$ and $5\frac{1}{4}$ while on the date of transfer, the shares ranged between $5\frac{1}{4}$ and $5\frac{5}{8}$. Since petitioner sold the stock to each of his children for his cost ($52,989.27), there was a gift element in the transfer.

to be taken before the merger became effective. Any possibilities that the merger would be abandoned by the companies themselves or stopped by a regulatory agency were "remote and hypothetical."

Based on the foregoing, we conclude that petitioner, and not the children, is liable for tax on the gain derived from the exchange of the 21,600 shares in connection with the merge.[5]

## 2. *Other Stock Trading in Children's Accounts During 1973*

Petitioner was an experienced trader in the securities market. On various occasions in 1973, he purchased stock for custodial accounts which he had set up for his two children, naming himself custodian. Petitioner provided the funds necessary for the purchase in the form of margin credits or cash transferred from brokerage accounts held in his own name. He treated this payment of the purchase price as loans to his children which he recorded on a bookkeeping entry sheet along with a 6-percent interest charge on the outstanding balance.[6]

All profits from such trading were reported by Scott and Sadie on separate income tax returns which their father prepared and filed for them. Petitioner treated the proceeds from the stock sales and any interest or dividend income

---

[5]Respondent has conceded that the children were each taxable on the exchange of the 400 National Realty shares which they acquired from petitioner by gift in December 1972. In his notice of deficiency, respondent determined that petitioner was taxable on the profit derived from the exchange of National Realty stock ($14,537.38) except as to the gain attributable to the gift of 800 shares, which respondent determined to be $11,978 ($5,989 per child). This latter amount was apparently overstated, and, as a result, respondent filed an amended answer in which he determined that the proper amount attributable to these shares was only $335.52 per child and thus asserted an increased deficiency in petitioner's income tax for 1973 in the amount of $6,952.56. See sec. 6214(a). Respondent has sufficiently shown that the original figure stated in the notice of deficiency was in error and we thus hold that respondent has met his burden of proof with respect to this point. See Rule 142(a), Tax Court Rules of Practice and Procedure.

[6]Respondent has taken the position that income derived from stock which was the subject of a gift to the children under the Uniform Gift to Minors Act is normally taxable to the children unless it is used to discharge a support obligation. See Rev. Rul. 59–357, 1959–2 C.B. 212; Rev. Rul. 56–484, 1956–2 C.B. 23. However, the parties agree in the instant case that the provisions of the New Jersey Uniform Gift to Minors Act, N.J. Stat. Ann. sec. 46:38–14 et seq. (West Supp. 1981), are not applicable since the funds advanced for the payment of the purchase price of the securities were loans and not gifts. See N.J. Stat. Ann. sec. 46:38–14(e), *supra*.

derived from the stock as reducing the outstanding advance balance which the children owed to him.[7] As petitioner testified "there's no doubt on how the proceeds were going to be applied because they would be given to me until some other opportunity arose." While petitioner recorded the proceeds on his entry sheet as loan repayments, he generally used these amounts to fund additional stock purchases for the children's accounts, utilizing the same arrangements heretofore described. Thus, one loan was paid off and another created, and the cycle of trading continued.

During the latter part of 1973, petitioner used a slightly different route to purchase and sell the securities. He purchased various securities in the margin account of Abe and Ben Applestein (petitioner's father and brother, respectively) at Kalb, Voorhis & Co. Since petitioner managed this account, he had access to the funds and margin available therein. Petitioner testified that as a result of these purchases, he was indebted to this account in the amount of the total purchase price.[8] Petitioner claims that he purchased these securities for the children's custodial accounts and that he treated the transactions as a transfer of stock to his children's accounts and a loan of the purchase price. Petitioner once again added these amounts to the children's outstanding advance loan balance. However, although petitioner claims that he transferred these securities to the children's accounts, these securities do not appear on the brokerage statement of the custodial accounts. The children, however, reported the gain upon the sale of such stock.[9] Petitioner explained the omission on the

---

[7]As a result of the notes the children executed with respect to the purchase of National Realty stock prior to the merger, the children had an outstanding loan balance before petitioner commenced trading for the children in the custodial accounts. Thus, petitioner applied the proceeds from the sales of stock in the account, and dividends and interest earned therefrom, to repay these prior loans along with amounts owed as a result of these stock purchases.

[8]Thus, petitioner, not his father and brother, must be considered the owner of these securities. There is no indication with respect to the two stocks purchased and sold in this account (see note 9 *infra* ) that petitioner reinvested the proceeds to purchase additional securities for this account or otherwise used the money for the benefit of his father and brother. In fact, petitioner admits that he used these proceeds as partial repayment of the children's debt.

[9]For example, on Dec. 14, 1973, petitioner purchased 1,000 shares of Airco, Inc., stock in the account of Ben and Abe Applestein and sold the stock 5 days later at a profit of $1,713.70. Although these shares were never listed on the children's account statements,

basis that the sales of such securities were made in the same account as the purchase thereof in order to reduce the amount of brokerage commissions.[10] Petitioner used the profits derived from the trading in the account of Abe and Ben Applestein to reduce the children's loan balance.

We must decide who is taxable on the income reported by Scott and Sadie in connection with the stock trading by petitioner. Petitioner claims simply that since he transferred the stock to accounts in the names of his two children, the children should be taxed on the income derived from the stock. Respondent contends, however, that the income should be taxed to petitioner on the basis that he exercised absolute control over the management of the account and that his skill, judgment, and funds were responsible for the realization of the income. After close analysis of the circumstances surrounding the creation and operation of the children's accounts, we believe that petitioner, and not the children, should be taxed on the gains derived from the stock in the accounts.

On the record before us, petitioner rather than his children had the benefits and burdens of ownership. The stock ostensibly purchased on behalf of the children in the account of Abe and Ben Applestein (petitioner's father and brother) was not even nominally owned by or for the children. Although the securities purchased with the cycle of loans from petitioner were nominally owned by the children, a different result is not warranted. For petitioner as "donor" never relinquished the burdens and benefits of ownership. He purchased assets with his funds that were offset by liabilities due him for the funds advanced. There were no notes specifying an interest rate, a

---

Scott and Sadie each reported a short-term capital gain of $856.85 attributable to the sale of 500 shares of Airco, Inc. In addition, Sadie and Scott each reported a capital gain from the sale of Grand Union stock although such stock never appeared in the children's accounts.

[10]On cross-examination, petitioner testified as follows:

Q. You stated that you transferred these securities back to the custodial accounts when you bought them. That's not entirely true, is it, Mr. Applestein?

A. Probably was, unless I made sales in the same account in order to save money, too, it's the same way.

Q. Did you, in fact, make sales in there?

A. Oh sure. I would—sure. I would transfer to them and put them all together and make one lump sale.

Q. In whatever account was convenient.

A. Yes, of course, because, here again, in the same way, the commission was based on the volume.

repayment schedule or date, or any of the indicia of an arm's-length loan.

Petitioner made ad hoc decisions concerning the profits realized by virtue of the obligations due him for the funds advanced, and, in trading across several accounts, he dealt with the property as though it was his own. In substance, nothing passed to the children when the assets were acquired, and nothing was intended to pass until some future time when the results of the trading were clear. As petitioner testified: "I was hoping that they would have bread and butter for income for the rest of their life, *at some point in time.*" That time might come when the children's loan balance recorded on petitioner's bookkeeping ledger was reduced to zero or merely when petitioner as a prudent father and benefactor felt that the time was right for the children to receive any profits.

All matters relative to the advances were subject solely to petitioner's discretion. He could advance more or less as he saw fit, he could apply sales proceeds to the balance due, and/or reinvest these proceeds as he chose. Through the various advances and loans along with his indiscriminate use of the various brokerage accounts, petitioner attempted to shift current income tax liability resulting from the stock trading to the children.[11]

Petitioner did not follow the clearly permissible route of simply transferring securities and thereafter managing them as custodian or natural guardian for the children subject to fiduciary requirements imposed by State laws.[12] Cf. *Anastasio v. Commissioner*, 67 T.C. 814, 818 (1977), affd. without opinion 573 F.2d 1287 (2d Cir. 1977) (income from property held by a

---

[11]Petitioner's use of his own account is aptly demonstrated by a "day trade" which petitioner executed in Sadie's custodial account on Oct. 11, 1973. On that date, petitioner purchased and sold shares of National General stock, realizing a short-term capital gain of $7,175.48 which was reported on Sadie's Federal income tax return. In executing this trade, petitioner advanced his own paycheck and authorized Kalb, Voorhis & Co. to transfer stock from his own account to Sadie's account in order to cover any sales of National General stock in her account. How and when the corresponding obligations to petitioner were to be settled as against the assets acquired was again wholly subject to petitioner's discretion in the use of the assets acquired.

[12]In fact, although petitioner set up the custodial brokerage accounts and designated himself custodian under the provisions of the New Jersey Uniform Gift to Minors Act, N.J. Stat. Ann. sec. 46:38–14 et seq. (West Supp. 1981), petitioner concedes that the act is inapplicable. See note 6 *supra.*

parent as custodian under Uniform Gift to Minors Act is taxable to minor children directly); *Prudence Miller Trust v. Commissioner*, 7 T.C. 1245 (1946); and *Pettus v. Commissioner*, 45 B.T.A. 855 (1941) (income from property held by parent as natural guardian for minor child taxable to child; no trust in existence for tax purposes since present and complete gifts of the property were made to the child). Rather, as pointed out earlier, the disposition of the proceeds was governed by petitioner's formalistic arrangements with the intention of retaining present control over the property and assigning only future profits to the children. See *Helvering v. Horst*, 311 U.S. 112 (1940); *Lucas v. Earl*, 281 U.S. 111 (1930). Indeed, the children presently received nothing more than a future right to receive the income resulting from these transactions. See *Helvering v. Horst, supra; Lucas v. Earl, supra; Gouldman v. Commissioner*, 165 F.2d 686, 689 (4th Cir. 1948), affg. a Memorandum Opinion of this Court; *Taylor v. Commissioner*, 27 T.C. 361 (1956), affd. 258 F.2d 89 (2d Cir. 1958); *Fitz Gibbon v. Commissioner*, 19 T.C. 78 (1952).

The transactions before us simply do not hold up under the careful scrutiny we are required to give them. Cf. *Helvering v. Clifford*, 309 U.S. 331 (1940); *Gouldman v. Commissioner, supra* at 689. As the Second Circuit said in affirming our decision in *Taylor v. Commissioner, supra*:

We think the Tax Court properly concluded that petitioner used her funds to produce income which, if the venture was successful, she intended to turn over to her relatives at some future time and that in the interim she exercised full control over the accounts and treated them as her own. Consequently, the investment property remained for all purposes that of petitioner. * * * Since income is taxable to him who owns the property which produces it, see Helvering v. Horst, 1940, 311 U.S. 112 * * * ; Lucas v. Earl, 1930, 281 U.S. 111 * * * , the profits are taxable to petitioner. * * * [258 F.2d 89, 92.]

Accordingly, we sustain respondent on this issue.

*Decision will be entered for the respondent.*