GEORGE ESCOBAR, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent; TEDDY FAY, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Escobar v. Commissioner
Docket Nos. 5952-78, 11256-79.
United States Tax Court
T.C. Memo 1983-205; 1983 Tax Ct. Memo LEXIS 579; 45 T.C.M. (CCH) 1326; T.C.M. (RIA) 83205; April 13, 1983. Wallace Musoff and Juris G. Cederbaums, for the petitioner in docket No. 5952-78. Richard I. Rosenkranz, for the petitioner in docket No. 11256-79. Jack H. Klinghoffer and Howard C. Rosenblatt, for the respondent. NIMS
MEMORANDUM FINDINGS OF FACT AND OPINION NIMS, Judge: In these consolidated cases, respondent determined deficiencies in petitioners' Federal income taxes and additions to tax as follows: Additions to Tax
Docket No.
Petitioner
Year
Deficiency
Sec. 6651(a)
Sec. 6653(a) [1]
5952-78
Escobar
1973
$65,421
$3,271
1974
4,536
$1,134
237
11256-79
Fay
1973
54,090
2,705
*580 Due to concessions by both parties, [2] the issues for decision are: 1) whether petitioner George Escobar was required to report a $99,740 short-term capital gain upon the sale of all the stock of Club Chain, Ltd. in 1973 and 2) whether petitioner George Escobar is liable for the additions to take under section 6653(a) for 1973 and 1974. FINDINGS OF FACT Some of the facts have been stipulated. The stipulation and exhibits attached thereto are incorporated herein by reference. Petitioners George Escobar (hereinafter "Escobar" or "petitioner") and Teddy Fay (hereinafter "Fay") resided *581 at New York, New York, at the time they filed their respective petitions. Escobar was born in Buenos Aires, Argentina. He had 15 years of schooling in that country, beginning with elementary school, and eventually became a grammar school teacher there.
In October, 1970, at the age of 22, Escobar came to the United States to live and work. Having had no formal education in the English language in Argentina and due to his immigration status, Escobar could not obtain employment in this country as a school teacher. In May, 1972, Escobar was working as a cashier and nighttime manager at Man's Country, Ltd., a bathhouse-gymnasium located at 53 Pierrepont Street, Brooklyn, New York. At that time he met Gerald E. Miller (hereinafter "Miller"), Man's Country, Ltd.'s attorney. Miller agreed to represent petitioner before United States immigration authorities. Man's Country, Ltd. was a corporation all of whose shares were owned by one Parker. Parker shared the profits of the corporation with Fay and promised to make Fay a "partner" in the business by giving Fay shares of stock. Fay, however, never received any shares of Man's Country, Ltd. At the end of May or early June, 1973, *582 Man's Country, Ltd. failed to pay the rent on the premises it occupied. The corporation received an eviction notice and a marshall's sale of its property occurred. At the marshall's sale, Sa-al-man Management, Inc. purchased all the assets of Man's Country, Ltd. for $267.50. Sa-al-man Management, Inc. reopened the bathhouse-gymnasium roughly three weeks after Man's Country, Ltd. ceased operation. The new corporation hired Fay as a "promotion manager" and Escobar as cashier and nighttime manager. Miller represented the new corporation, Sa-al-man Management, Inc. At some early point, Sa-al-man Management, Inc. became Club Chain, Ltd. Shortly before Man's Country, Ltd. closed, Miller told petitioner that he had run into some difficulties in petitioner's immigration case and that in order to prevent deportation at an immigration trial, petitioner would have to pay Miller an additional $5,000 to $6,000 in legal fees. Escobar told Miller that he was only making $145 to $150 per week at his current job and could not afford this additional fee. During the time between the closing of Man's Country, Ltd. and the reopening of its facilities under Sa-al-man Management, Inc., petitioner *583 was unemployed. At that time, Miller approached Escobar with a deal. Miller told Escobar that he needed a nominee to sign some papers in connection with the sale of Club Chain, Ltd. to new owners. If Escobar would sign various papers, Miller, in turn, would thereafter represent Escobar without charge before the immigration authorities. Escobar looked at the papers, but due to his poor English, did not completely read them. He questioned Miller whether he would get into trouble by signing the papers and Miller assured him that as his lawyer Miller would not tell him to sign any papers that would get him into trouble. Escobar then signed the papers.
Among the papers Escobar signed at the time was the following: MINUTES OF A SPECIAL MEETING OF THE BOARD OF DIRECTORS OF SA-AL-MAN MANAGEMENT, INC., held at the office of the corporation at 53 Pirrepont[sic] Street, Brooklyn, New York on the 7th day of July, 1973 at 10:00 P.M. The following were present: GEORGE ESCOBAR being a quorum and the sole director of the corporation. The secretary then presented and read to the meeting a waiver of notice of meeting subscribed by Mr. Escobar, as it was read, approved and ordered *584 filed with the minutes of this meeting. The President then advised that since there were now more than one stockholder of the corporation the election of either one or two additional directors was in order. Upon motion duly made, seconded and unanimously carried it was RESOLVED that CHARLES FLECK and ROBERT BATTENBERG be, and the same are hereby elected as Directors of this corporation to serve until the next annual meeting of the stockholders and the election and qualification of their successors. Having been advised of their election Mssrs. Fleck and Battenberg joined the meeting and participated in its further deliberations. The secretary then presented the resignation of Stephen Klein as President and the President announced that election of a new president was in order. Upon motion duly made, seconded and unanimously carried, it was RESOLVED that the resignation of Stephen Klein as President of this corporation be, and the same is hereby accepted and be it further RESOLVED that CHARLES FLECK be, and he hereby is elected President of this corporation to serve out the unexpired term of Stephen Klein.
The Secretary then presented the resignation of George Escobar *585 as Secretary and Treasurer of the corporation and the President announced that election of a new secretary and treasurer was in order. Upon motion duly made, seconded and unanimously carried, it was RESOLVED THAT the resignation of George Escobar as Secretary and Treasurer of this corporation be, and the same is hereby accepted and be it further RESOLVED [sic] that ROBERT BATTENBERG be, and he hereby is elected as Secretary and Treasurer of the corporation to serve out the unexpired term of George Escobar. The President then presented to the meeting an agreement which had been entered into relating to the sale of stock of George Escobar in the corporation to Club Chain Limited, Inc., and a brokerage agreement with Philip Lottinville, in connection with such sale. Upon motion duly made, seconded and unanimously carried, it was RESOLVED that this Board of Directors hereby ratify and approve the actions of the former officers in entering into an agreement with Club Chain Limited, Inc., and George Escobar with reference to the sale of a portion of Escobar's stock in the corporation to Club Chain Limited, Inc., and the accompanying brokerage agreement with Philip Lottinville *586 and be it further RESOLVED that the present officers are hereby authorized and directed to execute such notes and other instruments as may be required to effectuate the foregoing agreements and to proceed to act under and in accordance with such agreements. There being no further business before the meeting the same was, upon motion only made, seconded and unanimously carried, adjourned. /s/ Charles R. Fleck /s/ Robert Battenberg, Secretary /s/ George Escobar Dated: Brooklyn, New York, July 7, 1973 Escobar also at the same time signed the following document: AGREEMENT made and entered into as of the 15th day of August, 1973 by and between GEORGE ESCOBAR, residing at 183 Columbia Heights, Brooklyn, New York (hereinafter referred to as ESCOBAR), CLUB CHAIN, LTD. (formerly SA-AL-MAN MANAGEMENT, INC.) a New York corporation having its principal place of business at 53 Pierrepont Street, Brooklyn, New York (hereinafter referred to as CCL). CLUB CHAIN LIMITED, INC., an Chio corporation, having its principal place of business at 10404 Clifton Boulevard, Cleveland, Ohio (hereinafter referred to as CCLI) and CHARLES R. FLECK, residing at 1414 Elbur Avenue, Lakewood, Ohio, *587 THOMAS S. CROASMAN, residing at 7646 Woodward Avenue, Detroit, Michigan and JEROME SILVER residing at 23541 Cloverlawn, Oak Park, Michigan, (hereinafter jointly referred to as the PUROHASERS). WHEREAS, ESCOBAR is the owner of two hundred (200) shares of the capital stock of CCL, being all of the issued and outstanding shares of capital stock of CCL, and WHEREAS, ESCOBAR is desirous of disposing of the said two hundred (200) shares of the capital stock of CCL, and WHEREAS, the PURCHASERS are desirous of purchasing the said two hundred (200) shares of capital stock of CCL, NOW, THEREFORE, in consideration of the mutual convenants and agreements herein contained, and other good and valuable considerations, it is hereby agreed by the parties as follows: FIRST: ESCOBAR agrees to and does hereby sell, assign and transfer to the PURCHASERS all of his right, title and interest in and to the aforesaid two hundred capital shares of CCL. Said shares are to be assigned as follows: CHARLES R. FLECK
One Hundred four (104) shares
THOMAS S. CROASMAN
Forty eight (48) shares
JEROME SILVER
Forty eight (48) shares
SECOND: The purchase price for the aforesaid shares of *588 ESCOBAR shall be One Hundred Thousand ($100,000.00) Dollars, to be paid as follows: (a) The sum of Forty Thousand ($40,000.00) Dollars upon the execution of this agreement, the receipt whereof, by check, subject to collection is hereby duly acknowledged. (b) The balance of Sixty Thousand ($60,000.00) Dollars is to be paid by a series of twenty (20) promissory notes, each in the amount of Three Thousand ($3,00.00) Dollars and bearing interest at the rate of six (6%) per cent per annum. Said notes shall be payable monthly commencing with the 15th day of October, 1973 * * *. FOURTH: All of the stock of CCL shall be delivered to Gerald E. Miller, Esq., 1331 East 9 Street, Brooklyn, New York, to be held in escrow by him * * *. FIFTH: The PURCHASERS hereby agree to indemnify and hold ESCOBAR harmless from and against any and all liabilities and obligations of CCL arising out of any agreement, purchase, work performed, act or omission made, existing or occurring after July 7, 1973, and the PURCHASERS specifically agree to indemnify and hold harmless both ESCOBAR and Ted Fay against any and all claims which may be made under an agreement dated July 7, 1973 between CCL, ESCOBAR, *589 Ted Fay and Philip Lottenville, and approved by CCLI, relating to a commission to be paid to Lottenville in connection with an agreement between some of the parties dated July 7, 1973, or any additional claims of any nature, which may be made by Lottenville. TWELFTH: The parties hereto acknowledge that they are aware that Gerald E. Miller, Esq. has represented all of the parties to this agreement and that they are satisfied with the representation which they have received. IN WITNESS WHEREOF, the parties hereto have duly executed this agreement as of the day and year first above written. /s/ George Escobar GEORGE ESCOBAR CLUB CHAIN, LTD. By /s/ Charles R. Fleck CLUB CHAIN LIMITED, INCORPORATED
By /s/ Charles R. Fleck /s/ Charles R. Fleck CHARLES R. FLECK /s/ Thomas S. Croasman THOMAS S. CROASMAN /s/ Jerome Silver JEROME SILVER Escobar made the following bank deposits during 1973 and 1974: Deposits
Bank
1973
1974
Equitable Federal
$ 699
Manufacturers Hanover
8,320
$ 491
First National City
5,102
11,899
Emigrant Savings
3,661
322
Chase Manhattan
5,555
Total
$17,782
$18,267
In 1973 and 1974, Escobar reported *590 gross wages of $5,936.68 and $2,428, respectively. He reported no other income in those years. Miller prepared Escobar's 1973 Form 1040A free of charge, but did not sign the return as return preparer. In addition to depositing his payroll checks in his bank accounts in 1973 and 1974, Escobar used his bank accounts for the benefit of his employers: First, it was club policy that if Escobar, as cashier, accepted a traveler's check or personal check from a customer without sufficient identification, he would be required to deposit that check in his own bank account and withdraw an equivalent amount of cash from the account to turn over to the club. Escobar followed this procedure on Miller's instructions. Second, subsequent to his signing the papers in June, 1973, Escobar, on a weekly basis over a period of about two months, received a series of checks each in the amount of $750 from Robert Battenberg (hereinafter "Battenberg"). The checks were made out to either "George Escobar" or "Gerald E. Miller, attorney for George Escobar." If Miller was present when Escobar received the check, Escobar would endorse the check and hand it to Miller. If Miller was not present, Escobar would *591 deposit the check in one of his accounts and pay Miller the proceeds at a later date. Escobar followed this procedure also on Miller's instructions and because Battenberg told him he had to because he had signed the papers. Battenberg was the general manager of the club at the time. At the end of each day, Escobar would turn over all the money he would take in as cashier either to Battenberg or Miller.
In August or early September, 1973, Escobar and Fay became roommates, splitting the $210 per-month rent. On occasion, Fay lent Escobar money to pay the rent. Escobar also cashed some checks for Fay. During 1973 and 1974, Escobar borrowed $3,600 from Chase Manhattan Bank, borrowed from friends and received money from an aunt who was a federal judge in Argentina. Miller died on March 14, 1980. OPINION The main issue in this case is whether petitioner realized a $99,740 short-term capital gain in 1973 when the stock of Club Chain, Ltd. was sold to Charles R. Fleck, Thomas S. Croasman and Jerome Silver. Petitioner concedes he was the record owner of such shares at the time of the sale and has stipulated the size of the short-term capital gain realized at the sale. Petitioner *592 argues, however, that he was the mere nominee owner of the shares and that he did not keep any of the proceeds of the sale. Consequently, he contends, he is not taxable on the capital gain realized. Respondent, on the other hand, argues that petitioner has not met his burden of showing that he was not the beneficial owner of the Club Chain, Ltd. stock. Respondent characterizes petitioner's testimony as incredible and uncorroborated. He further points out that petitioner has not been able to identify precisely the beneficial owner of the shares and that if petitioner is not taxed on the sale profits, the gain may wholly escape taxation to anyone. We begin with an evidentiary ruling. Petitioner has attempted to introduce three affidavits of Miller, petitioner's former attorney and the attorney for all the corporations, purchasers and seller[s] herein. In each of these affidavits, Miller states that petitioner was not the equitable owner of the Club Chain, Ltd. stock and never received the proceeds of the disputed sale. Further, in two of the affidavits Miller states that he himself received all the proceeds of the sale and transmitted these funds to third parties. In one *593 of the affidavits, Miller states that the individual to whom he paid the sale proceeds was Salvatore Tripanni a/k/a "Tado Mack." [3] Respondent received copies of each of these affidavits at various times prior to the trial herein. Miller died prior to the trial. Petitioners have attempted to introduce these affidavits as hearsay by an unavailable declarant admissible under Rule 804(b)(1) or 804(b)(3) of the Federal Rules of Evidence.Rule 804(b) provides, in relevant part: (b) Hearsay exceptions.--The following are not excluded by the hearsay rule if the declarant is unavailable as a witness: (1) Former testimony.--Testimony given as a witness at another hearing of the same or a different proceeding, or in a deposition taken in compliance with law in the course of the same or another proceeding, if the party against whom the testimony is now offered, or, in a civil action or proceeding, a predecessor in interest, *594 had an opportunity and similar motive to develop the testimony by direct, cross, or redirect examination. (3) Statement against interest.--A statement which was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject him to civil or criminal liability, or to render invalid a claim by him against another, that a reasonable man in his position would not have made the statement unless he believed it to be true. A statement tending to expose the declarant to criminal liability and offered to exculpate the accused is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement. The simple answer to petitioner's argument under Rule 804(b)(1) is that Miller's ex parte affidavits are not admissible under that exception because they are not testimony from a prior hearing or deposition and respondent had no opportunity to cross-examine Miller in the affidavits. N.L.R.B. v. McClure Associates, Inc.,556 F.2d 725, 726 (4th Cir. 1977). Nor do we find the affidavits admissible under Rule 804(b)(3) of the Federal Rules of Evidence as statements against interest. *595 Petitioner contends the affidavits are statements against Miller's pecuniary interest because in them Miller admits to receiving the proceeds of the stock sale. Petitioner suggests that Miller would know that by making these affidavits, the respondent might seek to take him as the true owner of the Club Chain, Ltd. stock. Indeed, since Miller was an attorney, petitioner contends, Miller might have feared a criminal fraud prosecution for unreported income if he could not produce the real party in interest. We do not see these affidavits as so far contrary to Miller's pecuniary and penal interests "that a reasonable man in his position would not have made the statement[s] unless he believed [them] to be true." Rule 804(b)(3), Federal Rules of Evidence. Nowhere in the affidavits does Miller admit that he himself was the beneficial owner of the stock or keeper of the sale proceeds. He personally admits only to acting as a conduit for the cash. The role he portrays for himself, if believed, would not make him liable for any additional income taxes. Petitioner's argument essentially comes down to: Miller's statement was against his interest because he knew neither respondent *596 nor a court would completely believe it. By such reasoning, a protestation of innocence could be a statement against interest because it might not be believed. This reasoning strikes us as illogical and we reject it. Since the affidavits are hearsay not admissible under the exceptions cited by petitioner, they are excluded and we do not consider them in deciding this case. Rule 802, Federal Rules of Evidence.
Turning to the substantive issue, it is well settled that income is taxable to the real owner of the property, not merely the person who is nominal owner or agent. As we said in Taylor v. Commissioner,27 T.C. 361, 368 (1956), affd. 258 F.2d 89 (2nd Cir. 1958): The placing of legal title to property in the name of another does not, of itself, control the determination as to the ownership of the income of the property. David J. Pleason,22 T.C. 361 (1954), affd. 226 F.2d 732 (C.A. 7, 1955), certiorari denied 350 U.S. 1006 (1956). *597 In order for the income from such property to be taxable to the nominal owner, it must be clear that the parties intended that such owner, * * * have the right to demand the income or the property itself should he so wish. (Emphasis in original.) This statement, however, must be tempered by the further observation "that agency cannot be proved solely be declarations of the alleged agent, but must be established by independent proof." United States v. Consolidated Laundries Corp.,291 F.2d 563, 576 (2nd Cir. 1961). Having viewed the various witnesses and considered the documentary evidence in this case, we hold that petitioner Escobar was not the beneficial owner of the Club Chain, Ltd. stock sold in 1973. Respondent's case turns largely on the sale contract signed by Escobar which recites that Escobar "is the owner of * * * all of the issued and outstanding shares of capital stock of [Club Chain, Ltd.]." In addition, respondent has identified two checks connected with the sale (each of $750) which passed through Escobar's account in July, 1973. This evidence, *598 respondent contends, proves that Escobar was both nominal and beneficial owner of the stock sold. We disagree.
Escobar has given a credible explanation of the circumstances under which he signed the sale contract and cashed the above-mentioned checks. Without signing the sales contract he would have been unable to pay Miller's legal fees [4] and prevent his own deportation. Escobar also testified that he was never the owner of any of the entities which owned the bathhouse-gymnasium at which he worked. He testified that he was cashier and nighttime manager, but he always turned his money over to Miller or others at the end of each working day. He was not the boss, but merely a lower level employee. *599 Fay corroborated this testimony.
Further evidence corroborating Escobar's story is the fact that although respondent contends Escobar received $100,000 upon sale of the Club Chain, Ltd. stock, total deposits in Escobar's various bank accounts in 1973 and 1974 amounted to only $36,000. This amount includes petitioner's payroll checks as well as almost $14,000 in now conceded unreported income. Petitioner's mode of living on the fringes of the poverty level during the years in question strikes us as wholly inconsistent with even temporary control of substantial sums of money. While respondent has focused on the sale contract dated August 15, 1973, which recites that Escobar prior to the sale owned all the stock of Club Chain, Ltd. (formerly Sa-al-man Management, Inc.) he has neglected to notice minutes of a board of directors meeting of Sa-al-man Management, Inc. dated July 7, 1973, stating that additional directors of this corporation were being elected "since there were now more than one stockholder of the corporation" and ratifying the actions of Escobar "with reference to the sale of a portion of Escobar's stock in the corporation to Club Chain Limited, Inc." [Emphasis *600 added]. These minutes were introduced as respondent's exhibit. These two documents seem to contradict each other on the issue of how much stock Escobar owned in this period. There is no evidence in the record of any reconveyance of all the shares of Sa-al-man Management, Inc. to Escobar between July 7, 1973, and August 15, 1973. It is not even clear how Sa-al-man Management, Inc. became Club Chain, Ltd. With such an unexplained conflict in the documents, we are inclined to doubt their recitations of fact regarding Escobar's ownership of any shares of Club Chain, Ltd. prior to the August 15, 1973, sale. The fact that Escobar received checks connected with the sale of the stock in July, 1973 -- prior to the August 15, 1973, date on the sales contract -- and that the sales contract is typed on the same typeface as the minutes of the board of directors meeting further tends to corroborate Escobar's testimony that all the documents were signed at the same time in June, 1973. These facts are consistent with and lend credibility to Escobar's other testimony. We are inclined to accept at face value Escobar's assertions that he was an unwilling pawn in the sordid drama in which Miller *601 and others were the principal players. Based on all the facts and circumstances, and particularly the fact that Escobar's plausible story was corroborated by Fay, we find that Escobar was not the true owner of the Club Chain, Ltd. stock sold in 1973. To the extent proceeds from the disputed sale occasionally passed through Escobar's accounts, we think any proceeds he may have retained are already accounted for in the unreported income he has conceded for 1973 and 1974. He should not be taxed twice on such sums. Accordingly, we hold petitioner realized no capital gain in 1973 on the sale of the Club Chain, Ltd. stock. With Miller dead, the identity of the true owner or owners of Club Chain, Ltd. at the time of the sale may never be revealed. Escobar speculated, without offering any proof to support his speculation, that Miller himself might have been the owner, but that is mere conjecture. In any event, while any gain realized on the sale by unknown parties may now go untaxed, that is no justification for taxing Escobar with a $99,740 gain which we are satisfied he never realized. The remaining issue is the addition to tax for negligence or intentional disregard of rules *602 and regulations. Section 6653(a). Petitioner has conceded the receipt of $5,641 of unreported income in 1973 and $8,140 of unreported income in 1974. Although he claims he relied on his attorney in filling out his returns and thus should be relieved of the addition, there is no evidence in this record that he told his attorney about the existence of this unreported income while the returns were being prepared. Consequently, the imposition of the addition under section 6653(a) is sustained. See Johnson v. Commissioner,74 T.C. 89, 97 (1980), affd. on another issue 673 F.2d 262 (9th Cir. 1982). To reflect the foregoing, Decision will be entered under Rule 155 in docket No. 5952-78 and for petitioner in docket No. 11256-79.
Footnotes
1. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954, as in effect during the years in issue.↩
2. In docket No. 11256-79, respondent has entirely conceded his case. In docket No. 5952-78, respondent determined that petitioner George Escobar had unreported income attributable to unexplained bank deposits in 1973 and 1974 of $11,336 and $16,280, respectively. Petitioner now concedes that he had unreported income attributable to such deposits in the amount of $5,641 in 1973 and $8,140 in 1974; respondent now concedes petitioner had no further income attributable to unexplained bank deposits. The petitioner also concedes the addition to tax under section 6651(a) in docket No. 5952-78.↩
3. In a search of telephone books and respondent's records for all of New York City, respondent was unable to locate an individual answering to either of these names.↩
4. Petitioner testified Miller insisted on a further $5,000 to $6,000 to continue representing him before immigration authorities. Respondent has not determined that petitioner received barter income in the form of free legal services for signing the document, and accordingly we express no opinion on that subject. In any event, the record is too skimpy for us to determine what legal services, if any, petitioner in fact received from Miller and the fair market value of such services.↩