JOANNE L. SHARON, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent; LISA E. SHARON, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Sharon v. Commissioner
Docket Nos. 17288-88; 17410-88
United States Tax Court
T.C. Memo 1989-478; 1989 Tax Ct. Memo LEXIS 478; 57 T.C.M. (CCH) 1562; T.C.M. (RIA) 89478; August 31, 1989
Harry J. Kaplan, for the petitioners. Jeffrey Heinkel, for the respondent. DINAN
MEMORANDUM FINDINGS OF FACT AND OPINION DINAN, Special Trial Judge: These consolidated cases were heard pursuant to the provisions of section 7443A(b) of the Internal Revenue Code of 1986 and Rules 180, 181 and 182. [1]
Respondent determined the following deficiencies in and additions to petitioners' Federal income taxes: Taxable
Additions to Tax
Docket No.
Year Deficiency
Section 6661
17288-88
1985
$ 861.00  -0-
1986
$ 7,530.20
$ 1,882.55
17410-88
1985
$ 877.00  -0-
1986
$ 7,532.40
$ 1,883.10
*480 The issues for decision are: (1) whether petitioners owned an interest in various properties for Federal income tax purposes, and (2) whether petitioners are liable for additions to tax for substantial understatements of income tax under section 6661. Some of the facts have been stipulated. The stipulations of fact and accompanying exhibits are incorporated by this reference. FINDINGS OF FACT Both petitioners resided in Saratoga, California, at the time they filed their petitions. Petitioner Lisa Sharon was born December 7, 1966. Petitioner Joanne Sharon was born April 20, 1968. Petitioners are sisters. In the early 1970's, petitioners' father, Joel Sharon (hereinafter Mr. Sharon) embarked on a plan to transfer wealth from himself to his minor daughters. His intent was to build up a portfolio for them which they could use for their benefit later in life. The first asset Mr. Sharon transferred to his daughters was a percentage of his interest in 11-12 Realty Co., a partnership (hereinafter the partnership). The partnership owns a warehouse and trucking terminal in Brooklyn, New York. Mr. Sharon's father managed the partnership. Mr. Sharon, as well as his brother, *481 originally obtained their partnership interests from their father. Initially, Mr. Sharon had a 1/8 interest in the capital and net profits of the partnership. On December 31, 1970 Mr. Sharon assigned to each of his two daughters 1/4 of his interest in the partnership. On January 1, 1971, Mr. Sharon assigned his remaining interest in the partnership to his daughters. The method Mr. Sharon chose to assign his interest in the partnership to his daughters was to assign the interest to himself as the natural guardian of their property. Mrs. Sharon, petitioners' mother, consented to the transfers. [2]
*482 After the January 1, 1971, assignment, each petitioner held a 1/16 interest in the 11-12 Realty Co. partnership. The partnership generated income over the years including the taxable years in issue. The following table shows how much income each petitioner reported from the partnership on her Federal income tax returns (each petitioner reported an identical amount): Taxable
Ordinary
Taxable
Ordinary
Year
Income
Year Income
1973
$ 1,703.00
1980
$ 3,139.00
1974
$ 1,217.50
1981
$ 3,045.00
1975
$ 2,049.00
1982
$ 3,022.00
1976
$ 2,336.00
1983
$ 3,537.00
1977
$ 2,137.00
1984
$ 5,380.00
1978
$ 2,338.00
1985
$ 7,018.00
1979
$ 2,295.50
1986
$ 2,034.00
In addition, petitioners each reported a net section 1231 gain of $ 63,578 and a taxable capital gain of $ 25,431 for the taxable year 1986 from the partnership. Income for the years 1971 and 1972 are not listed because returns were not prepared for those years. Mr. Sharon deposited his daughters' partnership income in separate bank accounts opened for them. The bank accounts were in Mr. Sharon's name. As the funds began to accumulate in the bank accounts, Mr. Sharon used some *483 of the funds to purchase real property. The first property purchased was an apartment building referred to as "Fairchild Drive." It was purchased in December 1976 at a cost of $ 196,137. Mr. Sharon purchased the property 2/3 with petitioners' money and 1/3 his own. The deed was in Mr. Sharon's name. The Fairchild Drive property was sold in January, 1978 for $ 268,773.65 resulting in a gain of $ 72,636.65. Each petitioner reported a gain of 1/3 of that amount or $ 24,212.22 as a long-term capital gain on their 1978 returns. The next real property purchased was referred to collectively as the "Chiquita properties." The Chiquita properties consisted of three parcels; two were single family residences, 290 Chiquita and 310 Chiquita, and the other was a 12-unit apartment building, 300 Chiquita. These three properties were purchased in April, 1978. Mr. Sharon purchased the properties with petitioners' money, his own money and money from two additional investors, George Leder and Tod Spieker. George Leder had a 1/16 interest in the properties, Tod Spieker had a 1/8 interest in the properties, and petitioners each had a 27.0833 percent interest, as did Mr. Sharon. Mr. Sharon was *484 the only investor listed on the deed. The three Chiquita properties were sold separately. The 310 Chiquita property was sold in June, 1980. Its basis was $ 25,543. The amount realized from the sale was $ 83,711, resulting in a gain of $ 58,168. Petitioners each reported 27.0833 percent of that amount or $ 15,753 on her 1980 return, as long-term capital gain. The 12-unit apartment, 300 Chiquita, was sold in December, 1980. Its basis was $ 153,259. The amount realized from the sale was $ 337,060 for a gain of $ 183,801. Petitioners reported this as a long term capital gain on the installment method. [3] Accordingly, petitioners each reported a long-term capital gain of $ 12,431 for the taxable year 1980. Petitioners continued to report income from this sale in later years. The remaining Chiquita property, 290 Chiquita, was sold in February, 1981. Its basis was $ 12,772. The amount realized from the sale was $ 59,038 resulting in a gain of $ 46,266. Petitioners each reported a gain of 27.0833 percent of that amount or $ 12,530 as a long-term capital *485 gain. The next property purchased was the "Pamela properties" in 1981. Petitioners each had a 1/3 interest in them, as did Mr. Sharon. However, in 1982 Mr. Sharon adjusted the ownership interests in the properties to reflect the fact that he paid for additional improvements to the properties. After the adjustment, petitioners each had a 22.54 percent interest and Mr. Sharon had a 54 percent interest. The Pamela properties were sold in 1984. Their basis was $ 524,512. The amount realized from the sale was $ 760,520 resulting in a gain of $ 236,008. Petitioners each reported 22.54 percent of that amount or $ 53,149 on their 1984 Federal income tax returns as a long-term capital gain. In 1984 another property was purchased, the "Elm property." Petitioners each had a 25-percent interest in the property and Mr. Sharon had a 50-percent interest. Petitioners claimed proportional operating losses from this property during the years in issue. The property generated the following gains (losses) during the taxable years in issue: 1985
1986
Rents Received
$ 114,878 $ 82,968  Expenses
(122,249)  (150,706)  Depreciation
(78,492)   (82,780)   Gain (Loss)
($ 85,863) ($ 150,518)
Petitioners' Proportional
Share (Each)
($ 21,466) ($ 37,630)  *486 Petitioners also reported a gain from the sale of a Chiquita property during the taxable year 1985. Petitioners reported on their Federal income tax returns that the Chiquita property was purchased in January, 1983 and had a basis of $ 46,369. Petitioners further reported that the property was sold in December, 1985 and that the amount realized was $ 84,500, resulting in a gain of $ 38,131. Petitioners each reported 27.0833 percent of that amount or $ 10,327 as a long-term capital gain. The Chiquita property also generated income during taxable year 1985 in the following amounts as reported on petitioners' returns: 1985
Rents Received
$ 19,156 Expenses
(10,612)  Depreciation
(3,780)   Gain (Loss)
$ 4,764  Petitioners' Proportional
Share (Each)
$ 1,191  Because the property was purchased during a different year from the other Chiquita properties, we assume that it was a separate transaction. Mr. Sharon followed the same procedure in purchasing all the properties described herein. He used funds from petitioners' bank accounts along with his own funds to purchase the properties. As previously stated, the funds in petitioners' bank *487 accounts initially originated from the earnings of the partnership, but later included profits realized from the sales of the properties. Mr. Sharon was the only owner of the properties listed on the deeds. However, after he purchased the properties, he would assign to petitioners their proportional interests. The method he used to do this was the same as the method he used when transferring his partnership interest to petitioners. He would assign the properties to himself as the natural guardian of his daughters' properties. Mr. Sharon testified that he did not include his daughters' names on the deeds because, as minors, their names on the deeds could cause title problems. Mr. Sharon kept records concerning the bank accounts and the real properties. Unfortunately, most of the records were destroyed in a fire that consumed his and Mrs. Sharon's home in September, 1987. Mr. and Mrs. Sharon never converted the funds held for petitioners to their own use. In fact, in all respects Mr. and Mrs. Sharon treated those funds as petitioners' separate properties. Petitioners used the funds for private high school and private college tuition, camps, foreign travel and other items. *488 Mr. and Mrs. Sharon both testified that petitioners were free to spend the money as they saw fit. Had they not attended the more expensive private schools instead of public schools, petitioners could have used the savings for other expenditures. OPINION Respondent, in his statutory notice of deficiency, determined that petitioners did not own any interests in the Elm property and accordingly disallowed the losses petitioners claimed from it. Respondent further determined that petitioners did not own any interests in the Chiquita property and accordingly disallowed both income generated by it and the gain they reported from its sale. Respondent's determination in his statutory notice of deficiency is presumed correct. Petitioners bear the burden of proving that respondent erred in his determination. Welch v. Helvering, 290 U.S. 111 (1933); Rule 142(a). The first issue we must decide is whether petitioners owned any interests in the Elm property and Chiquita property for Federal income tax purposes. As a general rule, income is taxed to the person who earns it. Lucas v. Earl, 281 U.S. 111 (1930). With respect to property, he who owns *489 it is taxable on the income produced from it. Helvering v. Horst , 311 U.S. 112 (1940). In determining ownership for Federal income tax purposes, we are "not so much concerned with the refinements of title as * * * [we are] with actual command over the property taxed -- the actual benefit for which the tax is paid." Corliss v. Bowers, 281 U.S. 376, 378 (1930). Further, an assignor who "retains sufficient power and control over the assigned property" is treated as the owner thereof for tax purposes. Commissioner v. Sunnen, 333 U.S. 591, 604 (1948). Keeping these general rules in mind, we note that a line of cases has developed holding that a parent, as custodian for his minor child, may accept and hold property in that capacity without being charged as the owner thereof for Federal income tax purposes. In Frank v. Commissioner, 27 B.T.A. 1158 (1933), the taxpayer established brokerage accounts in the names of each of his daughters. Stock which previously had been given to his daughters by the taxpayer and his wife along with subsequent gifts of stock were deposited into the accounts. The taxpayer managed his *490 daughters' accounts but never used the accounts other than for the daughters' benefit. Our predecessor, the Board of Tax Appeals, recognizing the common law rule that "when a gift is made to a child the father as natural guardian may take possession and exercise complete dominion and control over the property for his child," [4] found that the taxpayer "was the natural and legal guardian of his minor daughters and his possession and control of the subject matter of the gifts constituted possession and control by the daughters." Frank v. Commissioner, supra at 1164. For that reason the Board did not hold him to be the owner of the accounts for tax purposes. Similarly, in Heller v. Commissioner, 41 B.T.A. 1020 (1940), the Board found that custodial accounts set up by the taxpayer for his minor *491 children were the properties of the children. The Board, in reaching that conclusion, stated that a minor is a competent donee and that "it is wholly consistent for a father to look after the property for minor children." Heller v. Commissioner, supra at 1030. In Pettus v. Commissioner, 45 B.T.A. 855 (1941) the taxpayer husband and father gave shares of stock to each of his children by endorsing stock certificates over to his wife as their natural guardian. The children were referred to as the "minor donees." He later tried to place their shares in trust. The Commissioner determined that the taxpayer was the owner of the stock. However the Board held that the initial gifts were complete and therefore the trusts were never formed. To reach that conclusion, the Board examined the elements of a gift, inter vivos, which are: (1) A donor competent to make the gift; (2) a donee capable of accepting a gift; (3) a clear and unmistakable intention on the part of the donor to divest himself of title, dominion, and control over the subject matter of the gift; (4) an irrevocable transfer by the donor to the donee, or to someone acting as trustee *492 or agent for the donee; and (5) an acceptance of the gift by or on behalf of the donee. [Pettus v. Commissioner, supra at 860 citing Swope v. Commissioner, 41 B.T.A. 213 (1940).] The Board, reiterating its rule stated in Heller v. Commissioner, supra, found that the children were capable of taking and accepting a gift and that the mother as natural guardian could accept the gift on their behalf. The Board also stated that whether the donor intended to divest himself of title, dominion and control over the property is a question of fact. The Board then found that the taxpayer had in all respects intended to part with his property. Accordingly, they held he had parted with control. The Board further found that the transfer was irrevocable because the property was to be turned over to the daughters upon their reaching majority. Pettus v. Commissioner, supra at 860. We have reached a similar result in cases where property given to minors is held by a custodian under the Uniform Gifts to Minors Act. In Anastasio v. Commissioner, 67 T.C. 814 (1977) affd. without published opinion *493 573 F.2d 1287 (2d Cir. 1977), the taxpayer, who was one year shy of majority, won $ 100,000 in the New York State Lottery. The proceeds were paid to petitioner's parents under the Uniform Gifts to Minors Act (New York). The taxpayer argued that he was not taxable on the lottery proceeds in the year of receipt because he did not enjoy the benefits of ownership until he reached majority. We held that the taxpayer under the Uniform Gifts to Minors Act was the owner of the lottery proceeds for Federal income tax purposes. Anastasio v. Commissioner, supra at 818. These cases are distinguishable from Helvering v. Clifford, 309 U.S. 331 (1940), because in these cases the custodian or natural guardian held the property for the benefit of the minor and the property became that of the minor upon reaching majority. In Helvering v. Clifford, supra, the Supreme Court held that the settlor of the trust was the owner thereof for tax purposes because he had retained so much control over the res that he never really parted with it. Therefore in order for a transfer of property to a custodian for the benefit of a minor to *494 be taxed to the minor, the custodian must regard the property as that of the minor in all respects. In other words, the custodian must do in substance what he is obligated to do in form. See Estate of Applestein v. Commissioner, 80 T.C. 331, 350-351 (1983). Furthermore, it is settled law that a trust set up by a parent for the benefit of minor children will not shift the incidents of taxation to the extent that the income therefrom is used to discharge his obligation of support. Helvering v. Stokes, 296 U.S. 551 (1935). The Court in Helvering v. Stokes reversed the decision of the Third Circuit per curiam based on its decision in Douglas v. Willcuts, 296 U.S. 1 (1935). The Court in Douglas held that the taxpayer was taxable on a trust set up for the benefit of his ex-wife as required in their divorce decree. Finding that the taxpayer had a legally enforcable support obligation to his ex-wife, the Court reasoned that the taxpayer had not altered the situation by forming a trust to satisfy his support obligation. The Court, in so holding stated: The creation of a trust by the taxpayer as the channel for the application *495 of the income to the discharge of his obligation leaves the nature of the transaction unaltered. Burnet v. Wells [289 U.S. 670 (1933)]. In the present case, the net income of the trust fund, which was paid to the wife under the decree, stands substantially on the same footing as though he had received the income personally and had been required by the decree to make the payment directly. [Douglas v. Willcuts, supra at 9.] With regard to gifts to minors, other than a transfer by means of a trust, we think that the principle of Douglas still applies -- namely, that a parent who owes a legally enforceable obligation of support to his children cannot escape taxation on property by transferring it to his children and then using income from the property to discharge his support obligation. To the extent so used, the transfer will be disregarded and the incidents of taxation with respect to the property will remain with the parent. See Miller v. Commissioner, 2 T.C. 285, 288 (1943). See also Estate of Chrysler v. Commissioner, 44 T.C. 55, 68 (1965) revd. without reaching this issue 361 F.2d 508 (2d Cir. 1966) *496 (where we held that to the extent custodial property could be used to discharge the decedent's support obligation it was includable in his gross estate under section 2036(a)). Turning to the cases before us, we must decide whether petitioners owned an interest in property that respondent determined they did not. In deciding whether petitioners owned any interests in the Elm property and Chiquita property, we will analyze all the properties bought and sold because the two properties in issue are but a part of a whole series of transactions. The method used to purchase all the properties was the same and the funds came from the same sources, the partnership and the properties previously sold. It is interesting to note that respondent disallowed petitioners' ownership in the Elm property and the Chiquita property but did not for either year in issue reduce the interest generated by the bank accounts or the income or capital gains generated by the partnership even though all those assets were held for petitioners by Mr. Sharon in a similar arrangement. Prior to 1984, there was in effect in California the Uniform Gifts to Minors Act, Cal. Civ. Code section 1154 *497 et seq. (West 1982). [5] Among other things, that Act allowed an adult person to make a gift of a security not in registered form to a minor by delivering it to an adult person other than the donor, a guardian of the minor or to a trust company, accompanied by a statement that the gift was given to the minor under the California Uniform Gifts to Minors Act. Cal. Civ. Code section 1156(a)(2) (West 1988). A security includes an interest in a partnership. Cal. Civ. Code section 1155(o) (West 1982). A similar rule applies to a gift of real estate. Cal. Civ. Code section 1156(a)(5) (West 1982). In the instant case, Mr. Sharon made no effort to comply with the Uniform Gifts to Minors Act. Indeed, with regard to the partnership interest, a donor cannot donate the property to himself as custodian for the minor. Cal. Civ. Code section 1156(a)(2) (West 1982). Furthermore, he could not have transferred *498 the property to himself as guardian of the minors because the term "guardian" in Cal. Civ. Code section 1156(a)(2) does not mean natural guardian. 1966 Uniform Gifts to Minors Act, comment to section 1(h), 8A U.L.A. 317 (1983). The California Uniform Gifts to Minors Act is not the exclusive method for making gifts to minors. Cal. Civ. Code section 1163(b) (West 1982). In California, a parent is the natural guardian of his children. In Re Rose, 171 Cal. App. 2d 677, 340 P.2d 1045 (1959),; Turner v. Turner, 167 Cal. App. 2d 636, 334 P.2d 1011 (1959). As such, a parent can accept property on behalf of his child. Spitler v. Kaeding, 133 Cal. 500, 65 P. 1040 (1901). In the present case, Mr. Sharon transferred his partnership interest to his daughters by accepting the interests as their natural guardian. He held the property for their exclusive benefit. Neither he nor his wife ever converted the income from the partnership to their own use. Mr. Sharon then used the money from the partnership to purchase properties on behalf of petitioners, again holding the property himself as natural *499 guardian for his daughters. The process continued throughout the purchase and sale of many properties. After each sale of property, Mr. Sharon would split the profits according to each person's ownership interest. He deposited petitioners' proportionate profits into bank accounts held for them. He also used the profits to purchase additional properties for petitioners. It was Mr. Sharon's intent to build a portfolio for his daughters. The purchase and sale of these properties along with the partnership income is the means he used to accomplish this goal. Mr. Sharon dutifully reported petitioners' share of the income and gains on petitioners' Federal income tax returns from taxable year 1973 up through the taxable years in issue. Mr. Sharon testified that he did not put petitioners' names on the deeds because that could cause problems with marketable title. This is a well-founded fear because a person can generally disaffirm contracts made during minority. If Mr. Sharon had wanted a fiduciary to manage petitioners' property without burdensome legal restrictions and wanted to avoid marketable title problems, he should have utilized the Uniform Gifts to Minors Act. However, *500 he did not. He instead held the property for his daughters as their natural guardian. We have recognized the right of a father to do so. Pettus v. Commissioner, supra.
Based on the foregoing we find that Mr. Sharon did not retain "control" over petitioners' interest in the properties such that he would be deemed the owner thereof for Federal tax purposes. Accordingly, petitioners owned their interest in the properties in question for Federal income tax purposes. Our analysis is not yet complete. We must now decide whether petitioners used any of the funds in question for support items. To the extent the property transferred from Mr. Sharon to petitioners was used for support, Mr. Sharon will be viewed as the owner thereof. Douglas v. Willcuts, supra.
What constitutes support is necessarily a state law question because it is state law which creates the support obligation of parent to minor child. In California "The father and mother of a child have an equal responsibility to support and educate their child in a manner suitable to the child's circumstances, taking into consideration the respective earnings or earning capacities *501 of the parents." Cal. Civ. Code section 196(a) (West Supp. 1989) [formerly section 196 (West 1982)]. This duty continues for any unmarried child until that child reaches age 19 or completes the 12th grade, whichever occurs first. Cal. Civ. Code section 196.5 (West Supp. 1989). [6] A civil action may be maintained on behalf of the child to enforce a parent's support obligation. Cal. Civ. Code section 196a (West 1982). Neither the Civil Code nor case law defines exactly what are support items. Clearly, college tuition expenses are not support items because the support obligation does not extend past the 12th grade. See Jones v. Jones, 179 Cal. App. 3d 1011, 225 Cal. Rptr. 95 (1986). Furthermore, we do not think that items which are clearly luxury items, such as European teen tours, are support items. However, whether private high school tuition is a support item is a much closer question. In Stone v. Commissioner, T.C. Memo. 1987-454, affd. without *502 published opinion 867 F.2d 613 (9th Cir. 1989), we considered whether a private high school education was an item of support in California. [7] We concluded that the California courts used the following factors in determining whether a parent is obligated to send his child to a private high school: If a child had special needs that would only be met by a private school, that would be an item of support. Similarly, if a child had been attending a private high school prior to a divorce, continuing the private education could be an item of support. Also important in determining whether private high school tuition is a support item are the parents' financial ability to pay tuition and the background, values, and goals of parents and child. In the instant case, Mr. Sharon transferred the partnership interests to petitioners when they were infants. The property *503 transactions continued throughout petitioners' childhood. The bank accounts generated interest throughout petitioners' childhood. It cannot be said that Mr. Sharon transferred the property for the specific purpose of using it to pay petitioners' private high school tuition. In fact, Mr. Sharon testified that the money was petitioners' to do with as they pleased. Had they not used the money for private high school tuition, they could have used it for other things. There is no indication that Mr. Sharon ever used petitioners' money for basic support items such as food, clothing, shelter, etc. It appears that petitioners spent the money on luxury items. Petitioners also spent the money on expensive private high school tuition. For the foregoing reasons, and based on the facts and circumstances peculiar to these cases, we find that in these cases petitioners' money was not used to discharge Mr. and Mrs. Sharon's obligation of support. Accordingly, no part of the income from petitioners' interests in the properties will be deemed to be that of the parents. The income and loss from petitioners' interests in the Elm property and Chiquita property are properly taxable to them. *504 The second issue we must decide is whether petitioners are liable for an addition to tax for substantial understatement of income tax under section 6661. Section 6661 provides for an addition to tax of 25 percent of the amount of underpayment attributed to a substantial understatement of income tax for any taxable year. Pallottini v. Commissioner, 90 T.C. 498 (1988). There is an understatement of tax if the amount of tax required to be shown on the return exceeds the amount of tax actually shown on the return. An understatement is substantial if it exceeds the greater of 10 percent of the tax required to be shown on the return, or $ 5,000. In these cases the addition to tax does not apply because we have found petitioners did not understate their tax liability. Decisions will be entered under Rule 155. Footnotes
1. All subsequent section references are to the Internal Revenue Code of 1954, as amended and in effect for the years in issue, unless otherwise indicated. All Rule references are to the Tax Court Rules of Practice and Procedure.↩
2. The following is the language and form Mr. Sharon used in the assignment documents (from the 12/31/70 assignment): Now, therefore, I do hereby give, transfer and assign one-fourth (1/4) or twenty-five percent (25%) of my abovementioned partnership interest in 11-12 Realty Co. to myself as the natural guardian of the property of my daughter Lisa Ellen Sharon; and I do hereby give, transfer and assign one-fourth (1/4) or twenty-five percent (25%) of my abovementioned partnership interest in 11-12 Realty Co. to myself as the natural guardian of the property of my daughter, Joanne Lara Sharon. Dated: December 31, 1970 /s/ Joel A. Sharon Donor - Assignor I hereby accept these gifts, assignments and transfers. Dated: December 31, 1970 /s/ Joel A. Sharon, Guardian Donee - Assignee I hereby consent to these gifts, assignments and transfers. Dated: December 31, 1970 /s/ Ann L. Sharon↩
3. We express no opinion as to whether petitioners properly elected to report this gain on the installment method.↩
4. Citing: Haynes v. Gwin, 137 Ark. 387, 209 S.W. 67 (1919); Richardson v. Emmett, 61 A.D. 205, 70 N.Y.S. 546 (1901); Spitler v. Kaeding, 133 Cal. 500, 65 Pac. 1040 (1901); Tucker v. Tucker, 138 Ia. 344, 116 N.W. 119 (1908); Moores v. Commissioner, 3 B.T.A 301↩ (1926).
5. This act was repealed by Stats. 1984, c. 243, Section 1 and replaced with the California Uniform Transfers to Minors Act, Cal. Probate Code section 3900 et seq.↩ (West 1988).
6. Cal. Civ. Code section 196.5↩ was added by Stats. 1985, c. 379 section 1, effective July 30, 1985.
7. See also Braun v. Commissioner, T.C. Memo. 1984-285↩ where we held that under the law of New Jersey since a parent had an obligation to send his child to college he also had an obligation to send his child to a private high school if it was appropriate in light of the surrounding circumstances.